# DEPARTMENT OF VETERANS AFFAIRS
## OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION
### WASHINGTON, D.C. 20420

| | |
|---|---|
| Mukesh Jain, *Complainant,* ) ) ) ) | |
| *v.* ) ) ) | **VA Case No.   200H-0642-2013104692** |
| Secretary, Department of Veterans Affairs ) ) ) | |
| *Agency.* ) | |

## FINAL AGENCY DECISION

### INTRODUCTION

In a formal EEO complaint filed October 26, 2013, the Complainant alleged that officials at the VA Medical Center in Philadelphia, Pennsylvania, discriminated against him as referenced below. The Department's Office of Resolution Management (ORM) accepted the complaint in its entirety and conducted an appropriate investigation.

At the conclusion of the investigation, the Department notified the Complainant in writing of the right to request either a hearing and decision by an EEOC administrative judge, with a subsequent final action by the Department, or an immediate final decision by the Department without a hearing.   The Complainant requested a final agency decision. Accordingly, ORM forwarded the complaint to the Department's Office of Employment Discrimination Complaint Adjudication (OEDCA) for an immediate final agency decision based on the investigative record.   OEDCA received the file from ORM on July 29, 2014.

### CLAIMS

A. Whether the Complainant was discriminated against based on race, age, sex, national origin, and reprisal when, on September 27, 2013, his supervisor, RS, issued him a memorandum (dated September 25, 2013), reassigning him from the position of Assistant Chief of Staff to the position of Staff Physician in Primary Care.

B. Whether the Complainant was discriminated against based on race, age, sex, national origin, and reprisal when, on October 13, 2013, he was removed from all management committees and service chief groups in which he previously participated.

C. Whether the Complainant was discriminated against based on race, age, sex, national origin, and reprisal when, on October 25, 2013, his tele-commute agreement was terminated.

D. Whether the Complainant was discriminated against based on race, age, sex, national origin, and reprisal when, on April 7, 2014, he became aware that he was not awarded his physician performance pay for Fiscal Year 2013.

E. Whether on the basis of race, age, sex, national origin, and reprisal, the Complainant was subjected to a hostile work environment as evidenced by the following:

1. On or about July 29, 2013, DH, the Acting Director, took no action when the Complainant reported RS, the Chief of Staff, for offensive conduct, humiliation and ignoring him (the Complainant).

2. On August 19, 2013, and other dates not specified, RS appointed physicians other than the Complainant to serve as Acting Chief of Staff.

3. On September 17, 2013, RS appointed another physician as Associate Chief of Staff.

4. On September 27, 2013, RS issued the Complainant a memorandum (dated September 25, 2013), reassigning him from the position of Assistant Chief of Staff to the position of Staff Physician in Primary Care.

5. On October 13, 2013, the Complainant was removed from all management committees and service chief groups in which he previously participated.

6. On October 16, 2013, the Complainant was told to return the parking sticker that was issued to him because of his previous management position.

7. On October 25, 2013, the Complainant was told he would have to relocate from his private office and share a room with two other physicians.

2

8.  On October 25, 2013, the Complainant's tele-commute agreement was terminated.

9.  On April 7, 2014, the Complainant became aware that he was not awarded his physician performance pay for Fiscal Year 2013.

10. On January 21, 2014, senior management officials (specific names not provided) of the Philadelphia VA Medical Center, excessively delayed approval of the Complainant's travel funded by VA Central Office.

## SUMMARY OF FACTS

The Complainant (Race: Asian; National Origin: Indian, Southeast Asia; Age: 55; Prior EEO Activity: Yes) was a physician at the Philadelphia VA Medical Center in Philadelphia, Pennsylvania. He identified his prior EEO activity as when he spoke to a Federal EEO attorney on July 29, 2013, and when he formally filed this complaint. (ROI, Tab B-1.)

RS (Responsible Management Official (RMO)) (Race: White; Age: 53; Sex: Male; National Origin: American; Prior EEO Activity: Yes) is the Chief of Staff at the Philadelphia VA Medical Center. He was the Complainant's immediate supervisor from 2011 to 2013. He was aware of the Complainant's race, sex and national origin, but was unaware his prior EEO activity and age. He became aware of this current complaint in October 2013. (ROI, Tab B-4.)

DH (RMO) (Race: White; Age: 57; Sex: Male; National Origin: England; Prior EEO Activity: Yes) is the Director at the Philadelphia VA Medical Center, and served as the acting director from July 15, 2013, until early September 2013. He became the permanent director on October 7, 2013. DH was within the Complainant's chain of command, but had no working relationship with him. He was aware of the Complainant's race, national origin and sex. He was unsure of the Complainant's exact age, but believes that he is in his late fifties or early sixties. He became aware of the Complainant's current claim on November 13, 2013. (ROI, Tabs A-6, B-1, B-5.)

MA (RMO) (Race: White; Age: 58; Sex: Male; National Origin: American; Previous EEO Activity) was the interim director of the Philadelphia VA Medical Center from September 9, 2013 to October 4, 2013. While interim director, he was within the Complainant's chain of command. MA was aware of the Complainant's sex and his approximate age. He was not aware of the Complainant's race, national origin or EEO activity. (ROI, Tab B-6.)

PO (RMO) (Race: White; Age: 53; Sex: Female; National Origin: American, Prior EEO Activity) is DH's Executive Assistant. In January 2014, she was the Acting Associate Director. She was aware of the Complainant's sex and national origin. She was not aware of his race, age or prior EEO activity. (ROI, Tab B-7.)

SL (Subject Matter Expert (SME) (Race: Caucasian; Age: 51; Sex: Female; National Origin: Italian; Prior EEO Activity: No) is a Human Resources (HR) Specialist and has no working relationship with the Complainant. (ROI, Tab B-8.)

GG (Complainant Witness) (Race: African-American; Age: 52; Sex: Female, National Origin: Caribbean-American; Prior EEO Activity: Yes) has been a staff doctor in Primary Care since 2012. RS is her supervisor. She does not have direct knowledge of the events, but had a similar situation of being reassigned by RS. (ROI, Tab B-2.)

KF (Complainant Witness) (Race: Black; Age: 55; Sex: Male; National Origin: African American; Prior EEO Activity: Yes) is a Program Specialist. He was involved in locating office space for the Complainant when he was reassigned to Primary Care. (ROI, Tab B-3.)

On July 19, 2013, the Complainant met with DH regarding his ongoing problems with RS and that he felt that RS was underutilizing and marginalizing him. During this meeting, the Complainant mentioned that he spoke to an EEO attorney about his work situation who advised him to speak with DH before filing a claim. (ROI, Tab B-1, B-5.)

From 2007 to September 2013, the Complainant was the Assistant Chief of Staff (ACOS) at the Philadelphia VA Medical Center. On September 25, 2013, MA, while acting as the interim director, signed a letter abolishing the Complainant's Assistant Chief of Staff position prepared by RS. (ROI, Tab B-1.)

On September 17, 2013, RS announced the appointment of ED (Race: Unknown; National Origin: Unknown; Sex: Female; Age: 50; Prior EEO Activity: Unknown) for the newly created Associate Chief of Staff for Clinical Operations position. The position was created by RS and was filled through direct hire without a vacancy announcement. (ROI, Tabs B-8, C-1.)

On September 27, 2013, the Complainant was reassigned to primary care. The 2013 fiscal year ended three days later. (ROI, Tab B-1.)

On October 13, 2013, RS removed the Complainant from the Executive Leadership Operations Council, VA Executive Leadership Group, Quality Council, Clinical Service Chiefs, Associate Chief of Staff, Executive Committee of Medical Staff and the Professional Standards Board committees. (ROI, Tab B-1, C-7.)

On October 16, 2013, RS told the Complainant to turn in his parking pass for the service chiefs' parking lot. The Complainant was given a regular parking pass for staff that was located in another area. The parking area that the Complainant had while Assistant Chief of Staff was in front of the hospital and was reserved for the Directors, Associate Chiefs of Staff and the Nurse Executive. (ROI, Tab B-1, B-4.)

On October 25, 2013, the Complainant was told that he would have to relocate from his private office and share a room with two other physicians.   On this same day, DH terminated his telework agreement.  (ROI, Tab B-1.)

For fiscal year 2013, the Complainant received an "Excellent" rating, as he did the previous six years.  He received performance pay for each year that he received an "Excellent" rating starting in 2006. The performance rating did not have any written justification.  (ROI, Tab B-1, C-5.)

RS recommended the Complainant for performance pay for fiscal year 2013.  However, DH disagreed and denied the Complainant's performance pay.  Performance pay is retroactive, and is based on the previous year's performance. There are separate guidelines for performance pay and performance evaluations, but no new performance pay guidelines were given to the Complainant for fiscal year 2013.   All performance pay must be paid by March of the following year.   This was the first time that DH was responsible for approving the Complainant's performance pay.  (ROI, Tab B-1, B-4, B-5, C-5.)

Of the 267 physicians at the facility with "Excellent" ratings, the Complainant was the only one to not receive performance pay in March 2014.  (ROI, Tab B-8.)

When the Complainant did not receive his performance pay, he contacted HR.  On April 7, 2014, he received notification from the Interim Chief of HR that he was not awarded performance pay for 2013.  On April 11, 2014, the Complainant amended this complaint to include this performance pay claim.  After the amendment, management issued him $8,750 in performance pay for fiscal year 2013.  (ROI, Tab A-6, C-6, C-7.)

Believing he had been subjected to discrimination, the Complainant made initial contact with an EEO counselor on September 25, 2013.  When counseling did not resolve the matter, he filed a formal complaint of discrimination on October 26, 2013.[1]  (ROI, Tabs A-3, A-5).

## ANALYSIS

### 1. Statement of Applicable Law

The law prohibiting discrimination based on race, sex, national origin and reprisal is Title VII of the Civil Rights Act of 1964, as amended, Section 701 et seq., 42 U.S.C. 2000e et seq. ("Title VII").  The law prohibiting discrimination against persons forty years of age and over is the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. Section 633a, as amended.  The same pattern of analysis developed under Title VII has generally been applied to age discrimination cases.  Federal sector equal employment opportunity regulations are set out in 29 C.F.R. Part 1614.

---

[1] All evidence and argument in the ROI and subsequent communications from the Complainant have been reviewed and analyzed, whether or not specifically cited herein.

***Disparate Treatment Analysis:***  In order to prevail in a disparate treatment claim, Complainant must satisfy the three-part evidentiary scheme fashioned by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Complainant must initially establish a prima facie case by demonstrating that he/she was subjected to an adverse employment action under circumstances that would support an inference of discrimination. See Furnco Construction Co. v. Waters, 438 U.S. 567, 576 (1978). Production of a prima facie case will vary depending on the facts of the particular case. See McDonnell Douglas, 411 U.S. at 802 n. 13. The burden then shifts to the Agency to articulate a legitimate, nondiscriminatory reason for its actions. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). To ultimately prevail, Complainant must prove, by a preponderance of the evidence, that the agency's explanation is pretextual, i.e., not the true reason for its actions. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 519 (1993).

***Prima Facie Case:***  The elements of a prima facie case of discrimination are determined by the factual circumstances of the case and the bases of discrimination alleged.  McDonnell Douglas, supra.  Here, the Complainant alleged disparate treatment with respect to her AWOL charge based on race, sex, age, reprisal and disability.

In order to establish a prima facie case of disparate treatment, a complainant must generally show: (1) membership in a protected class; (2) an employment situation comparable to that of other employees not of the same protected class; and, (3) treatment that is different than that experienced by those other employees with respect to the terms, conditions, or benefits of employment.  McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273 (1976); Scott v. Secretary of Defense, EEOC Appeal No. 01902727 (September 24, 1990).

Employees are in comparable employment situations when it is reasonable to believe that they would receive the same treatment in the context of a particular employment decision.  See, Lindemann & Grossman, Employment Discrimination Law, 3rd Ed., Chapter 2, pp. 30-33 (1996).  In order for comparative employees to be considered similarly situated, all relevant aspects of the complainant's situation must be nearly identical to those of the comparative employees. O'Neal v. Postmaster General, EEOC Request No. 05910490 (July 23, 1991); Powell v. Postmaster General, EEOC Appeal No. 01911979 (November 25, 1991).  Thus, in order to be similarly situated, the comparative employees must have dealt with the same supervisor and have been subject to the same standards. Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992).

Even in cases where there are no similarly situated employees, a complainant may be able to establish a prima facie case by showing: (1) membership in a protected class; (2) the occurrence of an adverse employment action; and (3) some evidence of a causal relationship between membership in the protected class and the adverse action.  Ward

v. U.S. Postal Service, EEOC Request No. 05920219 (June 11, 1992), citing Potter v. Goodwill Industries of Cleveland, 518 F.2d 864 (6th Cir. 1975) and Leftwich v. United States Steel Corporation, 470 F. Supp. 758 (W.D. Pa. 1979).

**Age Discrimination**: In order to prevail in an age discrimination claim under the ADEA, a Complainant must generally show membership in the group of persons protected under the ADEA (*i.e.*, persons age 40 or over); that the Complainant was subjected to an adverse employment action; and that the Complainant was disadvantaged in favor of a younger person because of his or her age. Simpson v. Midland-Ross Corp., 823 F.2d 937, (6th Cir. 1987); Polstorff v. Fletcher, 452 F.2d 17, (D. Ala. 1978) (citing Marshall v. Goodyear Tire & Rubber Co., 554 F.2d 730, (5th Cir. 1977). The younger person need not be outside the protected group, but must be sufficiently younger than the Complainant to permit an inference of discrimination. O'Connor, supra.

**Reprisal**: Title VII prohibits employer actions that are based on a retaliatory motive and are likely to dissuade a reasonable employee or applicant from engaging in protected EEO activity. See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); see also, 42 U.S.C. § 2000e-3(a). Thus, in cases involving reprisal, the criteria for establishing a prima facie case may require a showing that (1) the complainant engaged in a protected activity, (2) management was aware of the complainant's participation in the protected activity, (3) management effected some action which adversely impacted upon the complainant following the protected activity, and (4) the management action followed the protected activity within such a period of time that a retaliatory motive can be inferred. Hochstadt v. Worcester Found. for Experimental Biology, Inc., 425 F. Supp. 318 (D. Mass. 1976), aff'd, 545 F.2d 222 (1st Cir. 1976).

The action required in the third element need not be an ultimate, or even significant, personnel action. Therefore, any action by a management official that is likely to dissuade a reasonable employee or applicant from making or supporting a charge of discrimination is sufficient to satisfy this element of a prima facie case of reprisal. Petty slights, minor annoyances, and simple lack of good manners normally will not create such deterrence. See, Burlington Northern, supra. (finding that an assignment to more arduous and less desirable job duties, even if such duties fall within the scope of the complainant's job description, was likely to dissuade the plaintiff from making or supporting a charge of discrimination). See also, Equal Employment Opportunity Commission Compliance Manual, Vol. 2, Section 8, at 8-13 (Retaliation).

To prevail in a case alleging reprisal, it is sufficient for the complainant to show that his or her protected EEO activity was a motivating factor in the employment action at issue.[2]

---

[2] The Supreme Court has ruled that an aggrieved individual must show that the alleged retaliatory action would not have occurred "but for" his or her participation in protected EEO activity. Univ. of Texas Southwestern Med. Ctr. v. Nassar, U.S. No. 12-484 (2013). However, in the EEOC's view, the Nassar decision does not apply in the federal sector. Petitioner v. Dep't of the Interior, EEOC Petition No. 0320110050 (July 16, 2014), n.6. Thus, we continue to evaluate complaints of reprisal using the "motivating factor" standard.

***General Harassment Analysis:***   Discriminatory harassment based on age, race, national origin, sex, and reprisal consists of personal slurs or other denigrating or insulting verbal or physical conduct relating to an individual's age, race, sex, national origin, or prior EEO activity.   See, e.g., 29 C.F.R. Section 1606.8 (national origin discrimination).

In cases involving harassment, court and EEOC decisions have modified the McDonnell Douglas analytical approach in order to achieve "a sensible, orderly way to evaluate the evidence."  To establish a prima facie case of harassment, the complainant must show: (1) membership in a protected class; (2) unwelcome personal slurs or other denigrating or insulting verbal or physical conduct ; (3) that the harassment complained of was based on the complainant's membership in the protected class; and (4) that the harassment was sufficiently severe or pervasive to affect a term or condition of employment, and/or that the harassment had the purpose or effect of unreasonably interfering with complainant's  work performance and/or that the harassment had the purpose or effect of creating an intimidating, hostile, or offensive work environment. Compare McGinnis v. Secretary of Defense, EEOC Appeal No. 01902760 (November 15, 1990); Sexton v. U. S. Marine Corps, EEOC Appeal No. 01821475 (August 30, 1983); Cudjoe v. Secretary of the Navy, EEOC Appeal No. 01880743 (June 14, 1988); 29 C.F.R. Section 1604.11 (sexual harassment).

The following factors are pertinent to determining whether a work environment is hostile, intimidating, or abusive: (1) whether the conduct in question is verbal or physical, or both; (2) whether the conduct was repeated, and, if so, how frequently; (3) whether the conduct was hostile or patently offensive; (4) whether the alleged harasser was a supervisor or a coworker; (5) whether more than one person joined in the harassment; and (6) whether the harassment was directed at more than one individual.  King v. Hillen, 21 F.3d 1572 (Fed. Cir. 1994); Crane v. Postmaster General, EEOC Appeal No. 01924585 (April 22, 1993).

For harassment to be considered discriminatory, it must be severe or pervasive.  Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993).  Actual psychological or emotional injury is not required.  Harris, supra.  However, unless the conduct is very severe or persistent, a single incident or group of isolated incidents will not be regarded as discriminatory harassment.  See e.g. Scott v. Sears Roebuck and Co., 798 F.2d 210 (7th Cir. 1986); Hansen v. Department of the Air Force, EEOC Appeal No. 01920621 (September 10, 1992).   The conduct in question should be evaluated from the standpoint of a reasonable person, taking into account the particular context in which it occurred. Highlander v. K.F.C. National Management Co., 805 F.2d 804 (6th Cir. 1986).

A prima facie case of harassment may be rebutted by the production of evidence to show that: (1) the alleged conduct did not occur; (2) the conduct complained of was not unwelcome; and/or (3) the alleged harassment was not sufficiently severe or pervasive to  adversely affect the complainant's employment opportunities, to unreasonably

interfere with the complainant's performance, or to create an abusive working environment.

## 2. Discussion

We first discuss the Complainant's allegations of disparate treatment, Claims A through D, using the three-part McDonnell Douglas analysis.   We will then discuss his harassment claim, Claim B.

### *Prima Facie Case*

The above established order of analysis need not be followed in all cases.  Where, as here, management has articulated legitimate nondiscriminatory reasons for the employment decisions at issue, the factual inquiry can proceed directly to the third step of the McDonnell Douglas analysis, that is, the ultimate issue of whether Complainant has shown by a preponderance of the evidence that management's actions were motivated by unlawful discrimination. See U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 713-17 (1983); Holley v. Dep't of Veterans Affairs, EEOC Request No. 05950842 (Nov. 13, 1997).

Therefore, this decision does not include a prima facie case analysis on the bases of age, race, sex, national origin, and reprisal.

### a. Disparate Treatment – Claims A through D

Regarding Claim A, RS explained that there was no value in retaining the position of Assistant Chief of Staff.  As Chief of Staff, RS was told by HR that it was within his purview to reorganize his office to eliminate or add positions. He stated that he consulted with HR, which approved of abolishing the position.  He added that in 2011, outside consultants offered suggestions to reorganize the Medical Center because the facility was an "under-performer." Senior leadership was tasked to specifically change inpatient hospital flow and basic clinical operations. This was made a high priority. (ROI, Tab B-4.)

RS explained that the only way to systematically tackle the problem of hospital flow and the Emergency Department backlog was to recruit a person who could focus almost exclusively on the vital processes.  He recruited ED from a non-VA hospital because she had experience in hospital flow, which was the process of getting patients in and out of the emergency room properly.  To address the patient flow problem that senior leadership identified, RS created the Associate Chief of Staff of Clinical Operations.  He added that the Assistant Chief of Staff and the Associate Chief of Staff for Clinical Operations were two distinctive positions with different duties and responsibilities. This position specifically required patient flow experience.  (ROI, Tab B-4.)

RS also stated that he discussed the elimination of the Assistant Chief of Staff position with the former director prior to his departure. He also stated that did not know ED

before the recruitment process for the Associate Chief of Staff position, but she knew the former director, and came to the hospital and met people. He also stated that she was referred to him by a colleague. He denied that the abolishment or the reassignment were due to the Complainant's race, age, sex, national origin or EEO activity. (ROI, Tab B-4.)

DH's testimony supports RS's explanation. He added that selectee, ED was appointed to the position because of her expertise in patient flow, which was recommended by the consultants. He added that the Complainant's skills were better suited for Primary Care. He did not feel that the Complainant was discriminated against as due to his race, sex, age, national origin, or EEO activity. (ROI, Tab B-5.)

MA confirmed that as interim director, he signed the letter abolishing the Complainant's position and reassigning him to a staff physician. He explained that he has a general knowledge of the duties of the position but believes that the reassignment was related to clinical quality and that the abolishment of the position was being planned for a long time. He added that that there was no other management position for the Complainant. He further explained that since the position was a direct report to Chief of Staff, RS was the best person to assess if the position was needed. He denied that he discriminated or retaliated against the Complainant. (ROI, Tab B-6.)

Regarding Claim B, RS explained that when the Assistant Chief of Staff position was abolished, the Complainant was no longer responsible for the various committees. Therefore, he was taken out of the group emails and committees because he was no longer part of management and it was not relevant to his position in Primary Care. He added that he has removed other people from group emails and committees who were taken out of their positions. He denied that the Complainant was discriminated against because with his race, sex, age, national origin or EEO activity. (ROI, Tab B-3.)

DH added that he felt the Complainant did not need to be on the group emails because he was being reassigned to a staff doctor position. These assignments and email groups are more for service chiefs or management positions. The removal of these committees and groups were not due to his race, sex, age or national origin, or EEO activity. (ROI, Tab B-4.)

Regarding Claim C, DH stated that he revoked the Complainant's tele-commute agreement because as a Primary Care doctor, he needed to be at the facility caring for veterans. Since becoming the director he has looked across the board at tele-commute agreements and alternate work arrangements. He stated that these work agreements need to serve the organizational needs to better serve the veterans. DH also stated that he revoked other work agreements within the facility. (ROI, Tab B-4.)

RS's testimony supports DH's explanation. He stated that DH scrutinized telework agreements when he arrived at the facility. RS does not believe that the Complainant's EEO activity, race, age, sex or national origin were factors in this issue. (ROI, Tab B-3.)

Regarding Claim D, RS stated that he submitted the Complainant's name for a performance award, but DH disagreed.  After consultation with DH, RS felt that the Complainant did not go beyond his normal responsibilities and therefore did not warrant a performance award. He added that the Complainant did not take a lot of additional initiative because he felt he was underutilized.   He further explained that the Complainant's position was in "transition" and therefore did not warrant performance pay.   Although the Complainant received an "Excellent" rating, RS stated that performance ratings and performance pay were different and unrelated.  He denied that the Complainant's race, age, sex, national origin, or EEO activity were factors in this decision. (ROI, Tab B-4.)

DH acknowledged that the Complainant received an "Excellent" performance rating. He also stated that the Complainant did not accomplish any more than he was already obligated.   DH expressed his doubt about the Complainant's performance pay recommendation and agreed that his performance did not warrant performance pay for fiscal year 2013. (ROI, Tab B-5.)

The foregoing evidence is sufficient to raise a genuine issue of material fact as to whether the Complainant was discriminated against in connection with the matter raised in this complaint.   Thus, we find that management met its burden to articulate a legitimate, non-discriminatory reason for its conduct toward the Complainant with respect to this matter.  To prevail, the Complainant must show by a preponderance of the evidence that management's explanation is pretext and that management's action was actually based on discriminatory motives.

### *Pretext*

The Complainant attempts to show pretext by stating that RS created a premeditated plan to humiliate and marginalize the Complainant with the intent to get rid of his position and create a different position with similar duties so that RS could hire a physician that he liked. The Complainant also alleges that RS wanted to surround himself with younger, white and female physicians, and preselected another physician for the Associate Chief of Staff position.   He also stated that after he met with DH to discuss RS's behavior, he was retaliated against because he mentioned that he spoke to an EEO lawyer.   The Complainant also provided evidence that he was the only physician with an "Excellent" performance rating to not receive performance pay as evidence of pretext.   He also highlighted inconsistent explanations from RS regarding the abolishment of his position. To show pretext, a complainant must provide evidence proving management's reasons were factually baseless, were not the actual motivation for its decisions, or were insufficient to motivate its actions.   Balderston v., Fairbanks Morse Engine Div., 328 F.3d 309, 323 (7th Cir. 2003).  After a complete review of the record, we find that the Complainant fails to produce sufficient evidence to demonstrate that management's legitimate, nondiscriminatory reasons for its actions are pretextual. (ROI, Tab B-1.)

*Claims A through C*

Apart from his own assertions, the Complainant offered no evidence of pretext or discriminatory intent for Claims A through C. Generally, a complainant's testimony alone has been judged inadequate as proof to establish pretext. Bohrer v. Hanes Corporation, 715 F.2d 213 (5th Cir. 1983), cert. denied, 465 U.S. 1026 (1984). Furthermore, a complainant's subjective belief that the management action at issue was the result of discrimination is insufficient to prove pretext. See Bohrer, supra; Elliott v. Group Medical & Surgical Service, 714 F.2d 556 (5th Cir. 1983), cert. denied, 467 U.S. 1215 (1984).

Besides his own statements, and conjecture from his witnesses, the Complainant did not offer any direct or indirect evidence that management's actions were due to discriminatory animus or retaliation. Although he provided a thorough rebuttal to management's testimony, he has not established a nexus between his protected classes and management's actions for Claims A through C.

Regarding the abolished position and creation of the Associate of Staff position, the Complainant cites to the organizational chart to show that the Assistant Chief of Staff position was an official title, and that RS "created [the Associate Chief of Staff] position in a premeditated plan to bring [ED] on board and to abolish [his] position of Assistant Chief of Staff. However, the Complainant has not established a nexus between any of his protected classes and the abolishment of his position. The mere fact that ED is a white female who is six years younger is not sufficient to establish pretext. Moreover, we find that the six year age difference between the Complainant and ED is negligible.

The Complainant alleges that management officials wanted to abolish his position because they preselected ED to replace him with a new position that was functionally the same as the Assistant Chief of Staff position. He also highlighted inconsistencies in RS's explanation regarding how he first met ED, and how she was recruited for the position. Further, RS's answers conflicted with the SME regarding the abolishing of the Complainant's Assistant Chief of Staff position and the hiring of ED for the Associate Chief of Staff of Clinical Operations position. Although RS stated that he worked with the former Chief of HR (who has since retired from federal service) to abolish the Complainant's position, the SME stated that HR was not contacted and that no announcement was made for the new position. The Complainant also presented contemporaneous handwritten evidence by the Complainant indicating that the former Chief of HR seemed "surprised" by the abolishing of the Assistant Chief of Staff position when it was announced (which we will assume is credible for analysis purposes). (ROI, Tabs B-1, C-1, C-2, C-3, C-6, C-7.)

RS's lack of credibility, while troubling, does not necessarily establish that he was attempting to disguise a discriminatory animus. The inconsistencies in RS's explanation do not suggest that any of the Complainant's protected classes were factors in abolishing his position or the hiring of ED. It appears more likely that RS was attempting to disguise the fact that he did not consult with HR regarding the abolishing of the position and that he did not give notice to the Complainant. Furthermore, there appears to be animosity between the Complainant and RS (as evidenced by the

abolishing of the position without any notice to the Complainant) which could explain why RS wanted to bring in another person for a position that reports directly to him. However, the Complainant has not established a nexus between the abolishment of the position and his race, national origin, sex, or age.  Therefore, RS's lack of credibility is not probative of pretext.(ROI, Tabs B-4, B-8.)

The Complainant also has not shown that the abolishing of his position was due to reprisal.   He stated that the abolishing was the culmination of RS's two-year premeditated plan to undermine the Complainant that began prior to his July 19, 2013, meeting with DH.   The fact that this alleged plan occurred before RS knew of the Complainant's discussion with DH about his EEO concerns precludes a finding of pretext based on reprisal.  (ROI, Tabs B-1, B-5, C-1.)

The Complainant also alleges that ED was pre-selected for the new position, which is why there was no announcement.  However, pre-selection alone does not establish pretext. Jenkins v. Department of the Interior, EEOC Request No. 05940284 (March 3, 1995). Rather, there must be evidence that the pre-selection was motivated by discriminatory animus.  Goostree v. State of Tennessee, 796 F.2d 854, 861 (6th Cir. 1986).  It is not unlawful under Title VII to favor someone who the employer believes will perform the job better, or to be motivated by favoritism so long as the employer was not motivated by prohibited considerations.  Holder v. City of Raleigh, 867 F.2d 823, 825 (4th Cir. 1989); Benzies v. Illinois Dept. of Mental Health and Developmental Disabilities, 810 F.2d 146, 148 (7th Cir. 1987).   Therefore, even if ED was pre-selected for the position, it is not sufficient to establish pretext.

Regarding his revoked telework agreement, the Complainant offered no evidence of any similarly situated individuals who were allowed to keep their telework agreement after being transferred to primary care.   Furthermore, he offered no evidence to doubt management's explanation that since he was reassigned to a primary care role and had his administrative duties taken away, he had to be in the hospital to provide care to the patients.  He has also offered no evidence to doubt management's explanation that he was removed from the various email groups because he was no longer part of management. (ROI, Tab B-1, B-5.)

Accordingly we cannot conclude that management's actions undertaken due to discriminatory animus for Claims A through C.  For the foregoing reasons, we find that the Complainant failed to show by the requisite standard that management's explanation is pretext and that management's conduct was actually based on prohibited discriminatory motives.

Our finding that the complainant has not sustained his burden of persuasion is not an endorsement of the reorganization, revoked telework decisions in question, but merely reflects the limited focus of our inquiry. Title VII does not protect against unfair business decisions, but only against decisions motivated by an unlawful animus. Turner v. Texas Instruments, Inc., 555 F.2d 1251 (5th Cir. 1977).  To paraphrase the Burdine court, supra, the fact that a complainant may think that management inadequately considered

the Complainant's qualifications and accomplishments, or that the reorganization, revoked telework, and denied performance pay were carried out arbitrarily, does not in itself create Title VII liability. See also, St. Peter v. Secretary of the Army, 659 F.2d 1133, 1138 n.5 (D.C. Cir. 1981).

It is not a function of the EEO process to restrain management's employment decisions or to substitute another judgment for that of the deciding official. We cannot second-guess management's personnel decisions absent a demonstrably discriminatory motive. Loeb v. Textron, Inc., 600 F.2d 1003 (1st Cir. 1979). In this case there is insufficient evidence of such a motive.

*Claim D – Denied Performance Pay*

Regarding the denied performance pay, we find that the Complainant establishes by a preponderance of the evidence that he was retaliated against for his protected activity after DH and RS were officially notified of this EEO complaint on or about November 1, 2013. For fiscal year 2013, the Complainant received an "Excellent" rating, as he did the previous six years. He received performance pay for each of those years, which, according to RS, had to have been paid by March of the following year. However, the RS and DH did not award the Complainant performance pay for 2013, even though he received an "Excellent" rating.

We find that DH's explanation for not awarding the Complainant performance pay for 2013 unavailing. DH stated that after RS recommended the Complainant for performance pay, he asked RS to "justify" the award. DH stated that RS was not convincing, and that RS and he both agreed that the Complainant did not "go beyond his normal duties" to warrant the performance pay. He stated that he questioned other doctors' performance awards, which led to them also having their performance pay reduced or not granted any at all, but did not state whether these doctors had "Excellent" reviews. However, SL testified that out of 267 physicians with "Excellent" ratings, the Complainant was the only one to not receive performance pay. We find that this is probative evidence that the Complainant was targeted and casts doubt on management's explanation for denying him performance pay. (ROI, Tabs B-1, B-4, B-5, B-8.)

Furthermore, DH stated that since the Complainant was being "transitioned" to a new position, he was not eligible for performance pay. However, the "transition" only occurred six days prior to the end of the fiscal year. As indicated by DH and RS's testimonies, performance pay is intended to be based on performance for the past year, and not for prospective performance for his current duties.

Management also stated that the performance pay was unrelated to performance evaluations. However, there is no evidence that any of the standards were changed from the year before. Even if the standards were changed by DH, there is no indication that the changes were communicated to the Complainant at any time. Furthermore, the

changes likely would not have been effective since he became permanent director after the 2013 fiscal year in October.

We also note that the Complainant was eventually awarded $8,750 in performance pay in April 2014.  However, on April 7, 2014, the Complainant was told that by HR that he was not awarded performance pay for 2013.  When considered with RS's statement that all 2013 performance pay must be paid by March 2014, and DH's statement that the Complainant did not deserve performance pay, we find that the eventual performance pay award was likely in response to the Complainant's amendment, and that he was initially denied the award in March 2014.  (ROI, Tab B-1, B-4.)

For these reasons, and based on the entirety of evidence in the record, we find that the Complainant establishes by the preponderance of the evidence that he was retaliated against for his EEO activity when he was initially denied performance pay.

### b. Harassment – Claim E

We find that each of the events cited in Claim E occurred as alleged by the Complainant.  There is no material dispute regarding these events.  However, as an initial matter, we find that incidents 4, 5, and 8, addressed as Claims A through C, above, may not properly be considered as part of this harassment claim, given our determination that the actions were not motivated by discriminatory animus. See Oakley v. U.S. Postal Serv., EEOC Appeal No. 01982923 (Sept. 21, 2000).  See Epting v. Department of Veterans Affairs, EEOC Appeal No. 0120112534 (September 13, 2013).

Next, in evaluating whether or not the conduct at issue is harassing in nature, we note that aside from the denied performance pay, most of the events cited by the Complainant as evidence of the claimed harassment concern common workplace events and management decisions.  He cites to seven events that include several management actions such as a delayed travel approval, appointment of other physicians to serve as Acting Chief of Staff, revocation of a parking sticker, office relocation, and denied performance pay, as evidence of harassment.

Harassment consists of conduct which is not job-related, which is hostile or abusive, which is inappropriate in the work environment, and which is unnecessary to the proper functioning of the work unit.  Examples of harassment include epithets, slurs, negative stereotyping, gestures or other actions which are threatening, intimidating, or hostile, physical abuse, racial or ethnic jokes, and written or graphic material that is posted or circulated in the workplace and which denigrates or shows hostility or aversion toward an individual or group.  Harassment does not consist of dissatisfaction with a supervisor in connection with job-related matters, job-related events that an employee finds merely objectionable, normal stress associated with work, or the belief that job-related events are "harassing" in nature because they are motivated by discriminatory intent or bias.

Here, the Complainant's allegation of harassment, with the exception of the denied performance pay, consists solely with his dissatisfaction with management's job-related

decisions, or common workplace interactions. His belief that management's decisions may be based on discriminatory factors does not transform those decisions into harassment.   Where, as here, the conduct at issue consists of job-related management conduct, it is unnecessary to review that conduct as harassment merely because the Complainant has so labeled it.   As discussed above, they are routine workplace actions, and are a proper function of the office.

Furthermore, the Complainant has not shown that the conduct is sufficiently severe or pervasive to create an objectively hostile work environment.   Viewing the alleged harassing conduct under the King/Crane factors, we find that the Complainant failed to show that it was sufficiently severe or pervasive to constitute an objectively hostile work environment. Failure to achieve an ideal work environment does not violate Title VII. As the Supreme Court has stated, Title VII is not intended to be a "general civility code for the American workplace....Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion]...because of...sex." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998).  Furthermore, under federal EEO law, discriminatory harassment must be more than disagreements, interpersonal friction, or events that merely result in hurt feelings.   "Harassment, as the term is used in Title VII cases, refers to more than being subjected to stress." Lin v. U.S. Postal Service, EEOC Appeal No. 01932880 (December 23, 1993).  In coming to our conclusion, we considered our finding that DH and RS retaliated against the Complainant by not awarding him performance pay for fiscal year 2013.  However, we find that this sole event is not severe enough to be considered harassment. Accordingly, we find that the Complainant has failed to show that even viewed all together, the alleged incidents created conditions that were severe or pervasive, sufficient to create a hostile work environment.  See Harris, supra.

Based on the foregoing discussion, we find that the Complainant was not subjected to harassment within the meaning of federal EEO law.

## CONCLUSION

The Complainant established by the preponderance of the evidence that management officials retaliated against him for his EEO activity when he was initially denied performance pay (Claim D).  The Complainant fails to establish by a preponderance of the evidence that he was discriminated against for the remaining claims.

## REMEDIAL RELIEF

In view of the above finding of reprisal, we order the following relief and corrective action.

### 1. EQUITABLE RELIEF

Pursuant to 29 C.F.R. Section 1614.501(a)(5), the agency will commit to the Complainant in writing that it will cease from engaging in the unlawful employment

practice found in this case, namely, reprisal, that it will not engage in similar unlawful employment practices, that it will provide the Complainant a work place free from hostility, offensive conduct or abuse, and that no reprisal will be taken against the Complainant for filing and pursuing this or any other complaint under federal EEO law.

Within 30 days of its receipt of all necessary information, management will implement the remedial relief ordered in the foregoing paragraphs, and shall advise the Complainant in writing of (1) the amount of back pay and other attendant benefits due her and (2) how management reached its determinations regarding these matters. Management shall provide the Complainant with this written determination.

## 2. Compensatory Damages

The Department is liable for losses caused by the discrimination which occurred in this case. Although the Complainant did not specifically request compensatory damages, the evidence reasonably raises the possibility that the Complainant suffered losses which other forms of relief may not cover. However, there is insufficient evidence in the record from which to determine whether, or to what extent, the Complainant has incurred pecuniary or nonpecuniary losses due to the discrimination. Accordingly, we defer a decision on the specific amount of damages to be awarded pending receipt of a supplemental investigation report on the issue of damages.

Briefly, the Complainant must provide verifiable, objective evidence that (1) he incurred the damages and (2) that the damages resulted from the discrimination. A mere statement that the complainant deserves compensation for embarrassment, humiliation, lack of sleep, emotional distress, anxiety, etc., without supporting evidence, is not sufficient. Compensatory damage claims must be accompanied by evidence of both the injury or loss that was incurred and the connection between the injury or loss and the discriminatory conduct.

Compensatory damages may be claimed for past pecuniary losses, future pecuniary losses, and non-pecuniary losses. *Past pecuniary losses* are monetary or out-of-pocket expenses, such as medical, moving, or job search expenses, which the complainant has already incurred as a result of the discriminatory conduct. Evidence of such damages must establish two elements. First, the amount of the damages must be established through objective evidence such as bills, receipts, or canceled checks. Second, the evidence must establish the causal relationship between the discriminatory conduct and the alleged damages. *Future pecuniary losses* are out-of-pocket expenses, such as medical care or counseling, which will be incurred in the future because of the discriminatory conduct. Evidence of such damages usually requires expert testimony, and must establish three elements: (1) the likelihood of future expenses; (2) the approximate amount of future expenses; and (3) the causal relationship between the discriminatory conduct and the future expenses. *Non-pecuniary losses* are non-monetary harms or injuries, which are impossible to quantify exactly, such as pain and suffering, or loss of enjoyment of life. Evidence of non-

000176

pecuniary losses must show the nature, duration, severity, and cause of the claimed injury.

In accordance with guidance set forth in <u>Broughton v. U.S. Postal Service</u>, EEOC Appeal No. 01951999 (April 25, 1995), the Complainant is further advised as follows concerning claims of compensatory damages.

1. The Complainant should submit objective evidence such as statements concerning emotional pain or suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character or reputation, injury to credit standing, loss of health, and any other non-pecuniary losses that the Complainant believes were incurred as a result of the discriminatory conduct.  Such statements shall include a statement from the Complainant describing and itemizing <u>in</u> <u>specific</u> <u>detail</u> the claimed damages.

2. The Complainant may submit statements from credible witnesses, including family members, friends, health care providers, and other counselors (including clergy) describing the damages incurred and the types of treatments and/or medications prescribed.  Such statements may address, for example, the outward manifestations or physical consequences of emotional distress, including anxiety, sleeplessness, stress, depression, marital strain, fatigue, or a nervous breakdown.  In order for these statements to be acceptable as evidence, these witnesses must indicate that (a) <u>their statements are based on personal knowledge obtained through their own observations</u>, (b) must include <u>specific</u>, <u>detailed</u> information on the <u>physical and/or behavioral manifestations</u> of the pain, distress, anguish, etc.; (c) must include <u>information on the duration</u> of the distress or anguish (i.e., when did they first notice these manifestations and how long did these manifestations last; (d) must include specific <u>examples</u> of how the distress, anguish, etc., affected the complainant day to day, both on and off the job; and (e) must indicate the types of medication and/or treatment prescribed, if applicable.

3. Objective evidence also may include proof of the Complainant's actual out-of-pocket expenses (bills, receipts, etc.) related to medical treatment, counseling, medications, and so forth, that are directly related to or caused by the discrimination. If reimbursement is claimed for other types of losses or expenses, the Complainant must provide credible evidence, such as bills, receipts, canceled checks or other verifiable evidence indicating the exact nature and date(s) of the loss and/or expense.

4. The Complainant must establish a connection between the discriminatory action and the alleged harm resulting or injury. Hence, any evidence of medical expenses should include medical documentation such as statements from medical or other health care professionals who have treated the loss or injury claimed. If the medical condition existed prior to the discrimination, the Complainant must submit medical or other credible evidence indicating whether or not the condition worsened as a result of the discrimination, the length of time the Complainant had the condition prior to the discrimination, the type of medical treatment the Complainant received for the condition, and who provided the treatment. Evidence regarding other types of losses or expenses must also indicate (a) the exact nature of the loss or expense, (b) the date(s) of the loss, and (c) any other information that proves that the loss or expense occurred as a result of the alleged discrimination.

5. A request for compensatory damages may require the Complainant to disclose personal and sensitive information to the agency to enable the agency to determine whether the claimed harm or injury is linked in whole or in part to the discriminatory conduct.

This office has requested the Department's Office of Resolution Management (ORM) to conduct a supplemental investigation in order to obtain any additional information needed to reach a just and proper determination of the amount of damages to be awarded. Upon receipt of this decision, the Complainant shall have forty-five (**45**) days in which to provide the ORM investigator with any and all objective evidence, as described in the preceding paragraphs, pertinent to compensatory damages. The ORM investigator will contact the Complainant to obtain this evidence. Thereafter, based on the record, the evidence provided by the Complainant, and any additional evidence gathered in the supplemental investigation, this office will issue a final agency decision on damages. The decision will advise the Complainant of the right to appeal the decision to the EEOC and the right to file a civil action.

If the Complainant wishes to negotiate a settlement of the damages award with the facility director or staff office head, rather than having this office decide it, the Complainant should simultaneously submit the above requested information regarding damages both to the ORM investigator and the facility Director or staff office head, or that official's legal representative. Any such agreement must be reached prior to the issuance of a final agency decision by this office. The Department will not delay investigation and issuance of a decision on damages because of settlement negotiations unless the Complainant requests an extension of time in writing.

### 3. Attorney's Fees

The record in this case does not indicate that Complainant is currently represented by an attorney. However, the record may be incomplete, or Complainant may have

recently retained an attorney to assist in the further processing of the complaint. Therefore, we provide the following information concerning claims for attorney's fees and costs.

Any claim for fees must include a verified statement from the attorney of costs and attorney's fees. The statement must be accompanied by an affidavit from the attorney itemizing the charges for legal services. Specifically, the affidavit should chronologically detail the dates on which services were rendered, the person providing such services, the nature and extent of the services performed, and the number of hours expended. This affidavit is only a reconstruction of the services provided and does not, in itself, justify an award of attorney's fees. To be compensable, such services must be documented by contemporaneous billing records prepared the same day on which the services were actually provided. Consequently, copies of the applicable billing records must accompany both the affidavit and verified statement.

In addition to the above information, the affidavit must contain a statement as to the attorney's usual and customary hourly charge, as well as the usual and customary hourly charge for each person who worked on this case. It should, to the extent applicable, explain any distinction between in court and out of court fees, whether the fee was fixed or contingent, the nature and length of the professional relationship with this complainant, and any other factors which might affect the amount of attorney's fees in this case. The affidavit must describe the training and experience of each person who worked on this case, and the date of bar membership as applicable.

The claim should also include affidavits from other attorneys attesting to the prevailing market rate in the relevant geographic area for similar services, and any evidence regarding hourly rates that have been awarded in prior cases. It is the attorney's responsibility to prove the reasonableness of the requested hourly rate. The claim for fees <u>must</u> include a copy of the fee agreement between counsel and the complainant.

Finally, the claim must include any documentation (bills, receipts, statements, invoices, express or certified mail receipt numbers, delivery service documents, *etc.*) to support any charges for costs billed to the complainant. Failure to provide adequate documentation may result in denial of the claimed costs.

Except as noted below, EEOC's regulations permit payment of an attorney fee award only for services performed <u>after the filing of the formal, written complaint,</u> <u>and</u> <u>after</u> <u>notification to the agency that the complainant is represented by an attorney</u>. However, the regulations do permit compensation for services rendered prior to such notification for a reasonable amount of time spent deciding whether to represent the complainant. In addition, the regulations permit compensation for services rendered prior to the filing of a complaint where an EEOC administrative judge issues a decision finding discrimination, the Department issues an order that does not implement the decision, and EEOC upholds the administrative judge's decision on appeal.

Any claim for fees and costs must be submitted <u>both to this office</u> **and** <u>to the VA facility director or staff office head, or that official's legal representative</u>, within **30 days** of receipt of this decision. The submission to this office must indicate that a copy of the claim was served on that official or legal representative. This office will issue a final fee decision within 60 days of receipt of the claim, <u>provided</u> a copy of the claim has been served on the above official. The final fees decision will include notice of the right to appeal the decision respecting the amount of the attorney fee award.

If the Complainant wishes to negotiate a settlement of the attorney's fee award <u>with the facility director or staff office head</u>, rather than having this office decide it, such an agreement must be reached <u>prior</u> to the issuance of a final agency decision by this office. This office will not delay issuance of a decision on attorney's fees because of settlement negotiations unless the Complainant's attorney files a written request for an extension of time with this office.

## 4. COSTS

The Complainant is entitled to costs associated with the prosecution of this claim. The costs may include mailing, photocopying, and any other reasonable out-of-pocket expenses. A claim for costs must be filed with this office within **60** days of receipt of this decision. The claim <u>must</u> itemize the costs and be accompanied by documentary evidence (such as bills and receipts) to support the claim. Failure to provide such documentation will result in denial of the claim.

## 5. OTHER CORRECTIVE ACTION

In addition to making the Complainant whole, a remedy must be tailored to correct the particular source of the identified discrimination and to minimize the chance of its recurrence. Therefore, pursuant to 29 C.F.R. Section 1614.501(a)(2), the agency will take whatever corrective, curative, and preventive actions and will adopt whatever measures are necessary to ensure that violations of federal EEO law similar to those found in this case do not recur.

To this end, the agency shall provide responsible management officials (RMOs) Ralph Schapira and Daniel Hendee with EEO training for a minimum of <u>eight</u> hours of EEO training regarding the prevention and elimination of unlawful retaliation for engaging in protected EEO activity in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, <u>et</u> <u>seq.</u>

This training is mandatory and shall be provided by an ORM subject matter expert. It must be completed within 60 days of the date of this order. It may be completed in either one eight-hour session or increments of two hours or four hours. If an ORM trainer is unavailable, ORM will provide the training content, and the trainer identified by the facility must be certified by ORM as an EEO subject matter expert.

The agency should also consider taking disciplinary action against the above-referenced RMOs.  Such action may include, with respect to each RMO, counseling, issuance of an admonishment or a reprimand, suspension, and/or other disciplinary action that the agency considers appropriate under the circumstances.  Training is not considered disciplinary action.

The agency shall post at its Philadelphia facility copies of the attached Notice to Employees (Notice) regarding unlawful discrimination in violation of Title VII.  The agency shall post copies of the Notice, after being signed by the agency's duly authorized representative, within 30 days of the date of this order.  It shall remain posted for at least 60 consecutive days in conspicuous places, including those where notices to employees are customarily posted.  The agency shall take reasonable steps to ensure that copies of the Notice are not altered, defaced, or covered by any other material.

An appropriate management official shall sign and conspicuously post at the facility the attached notice of violation for a period of not less than 90 days.

## RIGHT OF APPEAL

Within 30 days of receipt of this final decision, the complainant has the right to appeal it to:  **Equal Employment Opportunity Commission, Office of Federal Operations, P.O. Box 77960, Washington, D.C. 20013**.  If an appeal is filed, EEOC Form 573 should be used.  A copy of EEOC Form 573 is attached.

A copy of the appeal to the EEOC **must** also be sent to the VA Office of General Counsel at the following address:  **Department of Veterans Affairs, Office of the General Counsel (024), 810 Vermont Ave., N.W., Washington, D.C. 20420.**

Statements or briefs in support of the appeal **must** be submitted to the EEOC within 30 calendar days of the filing of the appeal.  A copy of any such statement or brief, including any statements made on EEOC's "Appellant Docketing Statement", must also be sent to the VA's Office of General Counsel at the above address.

If an appeal is filed with the EEOC, the appeal, and any subsequently filed statement or brief, **must** contain a statement certifying the date and method by which copies of these documents were served on the VA's Office of General Counsel.

If the complainant files an appeal with the Commission beyond the above-noted time limit, the complainant should provide the Commission with an explanation as to why the appeal should be accepted despite its untimeliness.  If the complainant cannot explain why timeliness should be excused, the Commission may dismiss the appeal as untimely.

## RIGHT TO FILE A CIVIL ACTION

The complainant also has the right to file a civil action in an appropriate United States District Court. The complainant may file a civil action

within 90 days of receipt of this final decision <u>if no appeal to EEOC has been filed</u>; or

within 90 days after receipt of the EEOC's final decision on appeal; or

after 180 days from the date of filing an appeal with the EEOC if there has been no final decision by the Commission.

The complainant **must** name the person who is the official head of the Department of Veterans Affairs as the defendant. Department means the national organization, and not just the local office, facility, or unit in which the complainant works. The complainant may not name just the Department. The complainant must name **Robert A. McDonald** as the defendant. The complainant must also state the official title of the Department head. The official title of the head of the Department of Veterans Affairs is **Secretary of Veterans Affairs**. Failure to provide the name or official title of the head of the Department may result in dismissal of the case.

If the complainant decides to file a civil action under Title VII (discrimination due to race, color, religion, sex, national origin, or reprisal) or under the Rehabilitation Act of 1973, as amended, (discrimination due to disability), and if the complainant does not have or cannot afford the services of an attorney, the complainant may request that the Court appoint an attorney to represent the complainant and that the Court permit the complainant to file the action without payment of fees, costs, or other security. **The grant or denial of the request is within the sole discretion of the Court**. Filing a request for an attorney does not extend the time in which to file a civil action. Both the request and the civil action <u>MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS</u> of the date the complainant receives the final decision from the Department or the Commission.

_____                    _____
                                                                              Date

MAXANNE R. WITKIN
Director, Office of
Employment Discrimination
Complaint Adjudication

Attachment:  EEOC Form 573

## NOTICE TO EMPLOYEES

This Notice is posted pursuant to a recent Final Action or Decision issued by the Office of Employment Discrimination Complaint Adjudication (OEDCA), which found that a violation of Title VII occurred at this facility.

Federal law requires that there be no discrimination against any employee or applicant because of the person's RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE OR PHYSICAL or MENTAL DISABILITY with respect to hiring, firing, promotion, compensation, or other terms, conditions or privileges of employment. Federal law also prohibits REPRISAL against employees who participate in EEO proceedings or otherwise oppose unlawful discriminatory employment practices.

The Department of Veterans Affairs Medical Center in Philadelphia, Pennsylvania, supports and will comply with such Federal law and will not retaliate against individuals because they have exercised their rights under law.

The Department of Veterans Affairs Medical Center in Philadelphia, Pennsylvania, has remedied the discrimination found in OEDCA's Final Action or Decision.   The Department of Veterans Affairs Medical Center in Philadelphia, Pennsylvania, will ensure that officials responsible for personnel decisions and terms and conditions of employment will abide by the requirements of all federal equal employment opportunity laws and will not retaliate against employees who file EEO complaints.

The Department of Veterans Affairs Medical Center in Philadelphia, Pennsylvania, will not in any manner restrain, interfere, coerce, or retaliate against any individual who exercises his or her right to oppose practices made unlawful by, or who participates in proceedings pursuant to, Federal equal employment opportunity law.

_____

Signature of Appropriate Management Official

Date Posted:_____

Posting Expires:_____

**CERTIFIED MAIL**

OOD
Agency Case No. 200H-0642-2013104692

Mukesh Jain
12 Magnolia Court
Succasunna, NJ   07876

Dear Mr. Jain:

Enclosed is a copy of the Department's final agency decision concerning the above referenced complaint.

The final decision concludes that you were retaliated against because of your EEO claim when you were denied performance pay for fiscal year 2013. The relief to which you are, or may be, entitled is explained fully in the "Remedial Relief" section of the enclosed decision. The Director of the facility where the discrimination occurred has been notified of this final decision and instructed to implement the relief and corrective action ordered in the decision.

If you are dissatisfied with this final decision, you may appeal in accordance with the statement of appeal rights contained in the decision. Also enclosed is EEOC Form 573 for use if you wish to file an appeal.

Sincerely yours,

MAXANNE R. WITKIN
Director

Enclosures

12/12/2016                                          000184

OOD

Director (642/00)
Department of Veterans Affairs
Philadelphia VA Medical Center
3900 Woodland Avenue
Philadelphia, PA 19104

SUBJ: Final Agency Decision – Mukesh Jain
      Agency Case No. 200H-0642-2013104692

1. Enclosed are copies of the Department's final agency decision on the above complaint and our letters transmitting the decision to the Complainant.

2. As indicated in the enclosed decision, we have concluded that the Complainant was discriminated against with respect to the issues raised in the complaint. Accordingly, the Complainant is entitled to the equitable and other relief specified in the *Remedial Relief* section of the enclosed decision. <u>You must implement the *Equitable Relief* and *Other Corrective Action* within 30 days of receipt of this decision. You must also provide the complainant with a written determination regarding that relief.</u> Upon completion of the above actions, you must file a compliance report with the Deputy Assistant Secretary, Office of Resolution Management/Office of Policy and Compliance (08B), describing the steps taken to implement the relief awarded in this decision.

3. If you need assistance or have questions regarding implementation of such relief, you should contact the Office of Resolution Management's field EEO Officer or the Compliance Officer in ORM's Office of Policy and Compliance (08B).

4. As for attorney's fees and compensatory damages, this office will issue, at a later date, a separate final agency decision determining the amount, if any, to be awarded. The amount of attorney's fees awarded will be based on evidence submitted to us by the Complainant's attorney, if he has retained one. The amount of compensatory damages awarded will be based on evidence submitted by the Complainant as well as evidence gathered by means of a supplemental investigation. You will be responsible for payment of any such awards.

Page 2

Director (642/00)

5.  You may negotiate a settlement agreement with the Complainant provided we have not yet issued a final agency decision concerning the awards.  If you wish to negotiate such an agreement, you should seek advice and assistance from the Regional Counsel. We have requested the Complainant to provide you with a copy of the evidence submitted to this office in support of the attorney's fee and compensatory damages claims for your use should you wish to negotiate a settlement.

6.  If you wish to settle the amount of the award, you must do so as quickly as possible. This office will not delay issuance of a final agency decision because of pending settlement negotiations unless the Complainant submits a written request by fax to this office specifying the length of the requested delay.  If you do negotiate an agreement, you must notify this office immediately by faxing us a copy of the signed agreement. Our fax number is (202) 495-5912.

7.  The Department has no right of appeal from this final agency decision.


MAXANNE R. WITKIN
Director

Enclosures

OOD

Department of Veterans Affairs
Office of Resolution Management (08E)
151 Knollcroft Road, Building 16
Lyons, NJ  07939

SUBJ: Final Agency Decision – Mukesh Jain
      Agency Case No. 200H-0642-2013104692

1.    Enclosed are copies of the Department's final agency decision on the above complaint and our letters transmitting the decision to the Complainant.

2.    We have already provided a copy of our final decision to the facility director.

3.    Please enter the appropriate disposition data in the ORM database.

MAXANNE R. WITKIN
Director

Enclosures

**DEPARTMENT OF**                                        **MEMORANDUM**
**VETERANS AFFAIRS**

**DATE:**

**FROM:**   Director, Office of Employment Discrimination Complaint Adjudication
(00D)

**SUBJ:**   Request to Monitor Compliance – *Mukesh Jain*
ORM Case No. 200H-0642-2013104692

**TO:**   Deputy Assistant Secretary for Resolution Management/Office of Policy
and Compliance (08B)

1.    Attached is a copy of our final agency decision in the above-referenced
complaint.  As noted therein, we found that the Complainant was discriminated against
for his EEO activity when agency officials denied his performance pay for fiscal year
2013.

2.    The remedial relief awarded to the Complainant is noted in the attached decision.
We have provided the Director of the facility where the discrimination occurred with a
copy of the decision.  We have ordered that official to implement the equitable relief
award and other corrective action within 30 days of receipt of the decision, and
recommended that other preventive action be considered with respect to the officials
responsible for the discrimination.

3.    We have also advised that official to file a compliance report with your office
immediately upon completion of the steps taken to implement the relief.  Please monitor
this matter to ensure compliance with the equitable relief and corrective action awarded
or ordered in our decision that does not involve discipline.

Maxanne R. Witkin

Attachment

**DEPARTMENT OF**           **MEMORANDUM**
**VETERANS AFFAIRS**

**DATE:**

**FROM:**      Director, Office of Employment Discrimination Complaint
Adjudication (OOD)

**SUBJ:**      Request for Investigation of Compensatory Damages Claim – Mukesh
Jain, ORM Case No. 200H-0642-2013104692

**TO:**        Director, Office of Policy and Compliance (08B)

1.    Please investigate the compensatory damages claim relating to the above-referenced matter.

2.    We have, this date, advised the Complainant in the "Remedial Relief" section of the attached final agency decision of the type of evidence that he must submit with the claim to prove entitlement to damages. We have directed the Complainant to provide that evidence directly to the assigned investigator within 45 days of receipt of our decision. The investigator should contact the Complainant immediately to obtain that evidence.

3.    To prepare for the investigation, the assigned investigator should first review the law summary and "Damages Checklist" contained in Chapter XVII of OEDCA's manual entitled *A Guide to Investigating Employment Discrimination Complaints*. After examining the evidence submitted by the Complainant, the investigator should obtain affidavits, records, bills, receipts, reports, and other documents from the Complainant, facility officials, and other witnesses who might have information relevant to the complainant's evidence.

4.    The investigator should obtain an affidavit from the Complainant to supplement evidence provided by the Complainant in support of his claim for damages. The investigator should use the "Damages Checklist" contained in the above-referenced manual when interviewing the Complainant. The investigator should obtain detailed responses and dates to any items in the checklist that apply to the Complainant, and should follow up with additional related questions that might become apparent depending on the information provided by the Complainant.

Page 2

Director, Office of Policy and Compliance (08B)

5.     In addition to interviewing the Complainant, the investigator should obtain affidavits from other witnesses, if any, who may have knowledge of the injuries or losses claimed by the Complainant (*e.g.*, co-workers and others in a position to have observed the complainant, individuals identified by the Complainant as having knowledge of the injury or loss, *etc.*)   In addition, the investigator should notify the facility of the investigation, advise them of the specific damages being alleged and the evidence being offered to prove those damages, and provide them with an opportunity to submit any evidence they may have regarding the claim.  Such evidence might include leave records, testimony of agency employees who might have information regarding the Complainant's claims, medical or psychological exams administered by VA or non-VA personnel; applications for worker's compensation or disability retirement, *etc.*, consistent with *Privacy Act* restrictions.  Any such evidence should then be made available to the Complainant for an opportunity to clarify or explain the evidence.

6.     With regard to records that might be protected by the *Privacy Act* or other similar statutes (*e.g.*, health records, disability retirement applications, worker's compensation claims, *etc.*), the best approach for the investigator is to first identify those records available at the facility that might be relevant to the claim.  Then, the investigator should request the Complainant to consent in writing to their release by the facility to the investigator to be used solely for purposes of investigating this claim.    If the Complainant refuses to consent to release of the documents, and facility officials believe they lack authority to release the information without such consent, the investigator should specifically note in his or her investigation report that the Complainant refused to consent to release of the evidence.

7.     Submit a copy of your Report of Investigation to OEDCA within 75 days of your receipt of this letter, along with a request for a final agency decision on the damages claim.  Submit a copy of the report and your request for an FAD to the Complainant.  This report should not include a "legal analysis" as is done in regular investigation reports.  Instead, the report should merely contain a summary of all of the evidence obtained by the investigator that bears on the damages claim, along with exhibits containing the affidavits and other documentary evidence upon which the report is based.  If medical or other similar records are included as exhibits, the exhibits should be limited to only those documents from the record relevant to the claim.

Maxanne R. Witkin

Attachment

# Department of Veterans Affairs

## Memorandum

Date:

From:   Director, Office of Employment Discrimination Complaint Adjudication (00D)

Subject:   Decision Finding Discrimination and/or Awarding Monetary Relief *in re* Mukesh Jain

To:   Interim Under Secretary for Health (10A2E)

1.   For your information, we are enclosing a copy of the final decision concerning the discrimination complaint filed by the above-referenced individual.

2.   We have already advised the facility director to implement the remedial relief ordered in the decision or order.

MAXANNE R. WITKIN

Attachment(s)

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION**
**WASHINGTON, D.C. 20420**

| | | |
|---|---|---|
| **Mukesh Jain,** | ) | |
| *Complainant,* | ) | |
| | ) | |
| *v.* | ) | **VA Case No.   200H-0642-2013104692** |
| | ) | |
| | ) | |
| **Secretary,** | ) | |
| **Department of Veterans Affairs** | ) | |
| | ) | |
| *Agency.* | ) | |

## FINAL AGENCY DECISION

### INTRODUCTION

In a formal EEO complaint filed October 26, 2013, the Complainant alleged that officials at the VA Medical Center in Philadelphia, Pennsylvania, discriminated against him as referenced below. The Department's Office of Resolution Management (ORM) accepted the complaint in its entirety and conducted an appropriate investigation.

At the conclusion of the investigation, the Department notified the Complainant in writing of the right to request either a hearing and decision by an EEOC administrative judge, with a subsequent final action by the Department, or an immediate final decision by the Department without a hearing.   The Complainant requested a final agency decision. Accordingly, ORM forwarded the complaint to the Department's Office of Employment Discrimination Complaint Adjudication (OEDCA) for an immediate final agency decision based on the investigative record.   OEDCA received the file from ORM on July 29, 2014.

### CLAIMS

A. Whether the Complainant was discriminated against based on race, age, sex, national origin, and reprisal when, on September 27, 2013, his supervisor, RS, issued him a memorandum (dated September 25, 2013), reassigning him from

the position of Assistant Chief of Staff to the position of Staff Physician in Primary Care.

B. Whether the Complainant was discriminated against based on race, age, sex, national origin, and reprisal when, on October 13, 2013, he was removed from all management committees and service chief groups in which he previously participated.

C. Whether the Complainant was discriminated against based on race, age, sex, national origin, and reprisal when, on October 25, 2013, his tele-commute agreement was terminated.

D. Whether the Complainant was discriminated against based on race, age, sex, national origin, and reprisal when, on April 7, 2014, he became aware that he was not awarded his physician performance pay for Fiscal Year 2013.

E. Whether on the basis of race, age, sex, national origin, and reprisal, the Complainant was subjected to a hostile work environment as evidenced by the following:

   1. On or about July 29, 2013, DH, the Acting Director, took no action when the Complainant reported RS, the Chief of Staff, for offensive conduct, humiliation and ignoring him (the Complainant).

   2. On August 19, 2013, and other dates not specified, RS appointed physicians other than the Complainant to serve as Acting Chief of Staff.

   3. On September 17, 2013, RS appointed another physician as Associate Chief of Staff.

   4. On September 27, 2013, RS issued the Complainant a memorandum (dated September 25, 2013), reassigning him from the position of Assistant Chief of Staff to the position of Staff Physician in Primary Care.

   5. On October 13, 2013, the Complainant was removed from all management committees and service chief groups in which he previously participated.

   6. On October 16, 2013, the Complainant was told to return the parking sticker that was issued to him because of his previous management position.

7. On October 25, 2013, the Complainant was told he would have to relocate from his private office and share a room with two other physicians.

8. On October 25, 2013, the Complainant's tele-commute agreement was terminated.

9. On April 7, 2014, the Complainant became aware that he was not awarded his physician performance pay for Fiscal Year 2013.

10. On January 21, 2014, senior management officials (specific names not provided) of the Philadelphia VA Medical Center, excessively delayed approval of the Complainant's travel funded by VA Central Office.

## SUMMARY OF FACTS[1]

The Complainant (Race: Asian; National Origin: Indian, Southeast Asia; Age: 55; Sex: Male; Prior EEO Activity: Yes) was a physician at the Philadelphia VA Medical Center in Philadelphia, Pennsylvania. He identified his prior EEO activity as when he spoke to an attorney that specializes in federal EEO law on July 29, 2013, and when he formally filed this complaint. (ROI, Tab B-1.)

RS (Responsible Management Official (RMO)) (Race: White; Age: 53; Sex: Male; National Origin: American; Prior EEO Activity: Yes) is the Chief of Staff at the Philadelphia VA Medical Center. He was the Complainant's immediate supervisor from 2011 to 2013. He was aware of the Complainant's race, sex and national origin, but was unaware of his prior EEO activity and age. He became aware of the subject complaint in October 2013. (ROI, Tab B-4.)

DH (RMO) (Race: White; Age: 57; Sex: Male; National Origin: England; Prior EEO Activity: Yes) is the Director at the Philadelphia VA Medical Center, and served as the acting director from July 15, 2013, until early September 2013. He became the permanent director on October 7, 2013. He was the Complainant's second-level supervisor and aware of his race, national origin and sex. He was unsure of the Complainant's exact age, but believes that he is in his late fifties or early sixties. He became aware of the Complainant's complaint on November 13, 2013. (ROI, Tabs A-6, B-1, B-5.)

MA (RMO) (Race: White; Age: 58; Sex: Male; National Origin: American; Previous EEO Activity) was the interim director of the Philadelphia VA Medical Center from September 9, 2013 to October 4, 2013. While interim director, he was the Complainant's second-level supervisor. MA was aware of the Complainant's sex and his approximate age. He

---

[1] All evidence and argument in the ROI and subsequent communications from the Complainant have been reviewed and analyzed, whether or not specifically cited herein.

was not aware of the Complainant's race, national origin or EEO activity.  (ROI, Tab B-6.)

PO (RMO) (Race: White; Age: 53; Sex: Female; National Origin: American, Prior EEO Activity) is DH's Executive Assistant. In January 2014, she was the Acting Associate Director.  She was aware of the Complainant's sex and national origin. She was not aware of his race, age or prior EEO activity.  While serving as Acting Associate Director, she was responsible for approving the Complainant's travel arrangements. (ROI, Tab B-7.)

SL (Subject Matter Expert (SME) (Race: Caucasian; Age: 51; Sex: Female; National Origin: Italian; Prior EEO Activity: No) is a Human Resources (HR) Specialist and has no working relationship with the Complainant.  (ROI, Tab B-8.)

GG (Complainant Witness) (Race: African-American; Age: 52; Sex: Female, National Origin: Caribbean-American; Prior EEO Activity: Yes) has been a staff doctor in Primary Care since 2012.  RS is her supervisor.  She does not have direct knowledge of the allegations in this complaint but had a similar situation of being reassigned by RS. (ROI, Tab B-2.)

KF (Complainant Witness) (Race: Black; Age: 55; Sex: Male; National Origin: African American; Prior EEO Activity: Yes) is a Program Specialist.  He was involved in locating office space for the Complainant when he was reassigned to Primary Care.  (ROI, Tab B-3.)

On July 19, 2013, the Complainant met with DH regarding his ongoing problems with RS and expressed that he felt that RS was underutilizing and marginalizing him.  During this meeting, the Complainant mentioned that he spoke to an EEO attorney about his work situation who advised him to speak with DH before filing a complaint. (ROI, Tab B-1, B-5.)

From 2007 to September 2013, the Complainant was the Assistant Chief of Staff (ACOS) at the Philadelphia VA Medical Center. On September 25, 2013, MA, while acting as the interim director, signed a letter abolishing the Complainant's Assistant Chief of Staff position.  The letter was prepared by RS and did not state the reasons for abolishing the position.  (ROI, Tab B-1, C-3.)

On September 17, 2013, RS announced the appointment of ED (Race: Unknown; National Origin: Unknown; Sex: Female; Age: 50; Prior EEO Activity: Unknown) as the newly created Associate Chief of Staff for Clinical Operations position.  The position was created by RS and was filled through "direct hire" without a vacancy announcement.  (ROI, Tabs B-8, C-1.)

On September 27, 2013, the Complainant was reassigned to Primary Care. The 2013 fiscal year ended three days later.  (ROI, Tab B-1.)

On October 13, 2013, RS removed the Complainant from the facility's Executive Leadership Operations Council, VA Executive Leadership Group, Quality Council, Clinical Service Chiefs, Associate Chief of Staff, Executive Committee of Medical Staff and the Professional Standards Board committees. (ROI, Tab B-1, C-7.)

On October 16, 2013, RS told the Complainant to turn in his parking pass for the service chiefs' parking lot. The Complainant was given a regular parking pass for staff that was located in another area. The parking area that the Complainant had while Assistant Chief of Staff was in front of the hospital and was reserved for the Directors, Associate Chiefs of Staff and the Nurse Executive. (ROI, Tab B-1, B-4.)

On October 25, 2013, the Complainant was told that he would have to relocate from his private office and share a room with two other physicians. On this same day, DH terminated his telework agreement. (ROI, Tab B-1.)

For fiscal year 2013, the Complainant received an "Excellent" rating, as he did the previous six years. He received performance pay for each year that he received an "Excellent" rating, starting in 2006. The performance rating did not have any written justification. (ROI, Tab B-1, C-5.)

RS recommended the Complainant for performance pay for fiscal year 2013. However, DH disagreed and denied the Complainant's performance pay because he did not go beyond his normal responsibilities. Performance pay is retroactive, and is based on previous year's performance. There are separate guidelines for performance pay and performance evaluations. No new performance pay guidelines were given to the Complainant for fiscal year 2013. All performance pay must be paid by March of the following year. This was the first time that DH was responsible for approving the Complainant's performance pay. (ROI, Tab B-1, B-4, B-5, C-5.)

Of the 267 physicians at the facility with "Excellent" ratings, the Complainant was the only one to not receive a performance payout in March 2014. (ROI, Tab B-8.)

When the Complainant did not receive his performance pay, he contacted HR. On April 7, 2014, he received notification from the Interim Chief of HR that he was not awarded performance pay for 2013. On April 11, 2014, the Complainant amended this complaint to include the performance pay claim. He stated that as of May 19, 2013, he did not receive any performance pay. Management eventually issued him $8,750 in performance pay for fiscal year 2013, but the exact date that it was issued is unknown. (ROI, Tab A-6, C-6, C-7.)

Believing he had been subjected to discrimination, the Complainant made initial contact with an EEO counselor on September 25, 2013. When counseling did not resolve the matter, he filed a formal complaint of discrimination on October 26, 2013. (ROI, Tabs A-3, A-5).

## ANALYSIS

### 1.  Statement of Applicable Law

The law prohibiting discrimination based on race, sex, national origin and reprisal is Title VII of the Civil Rights Act of 1964, as amended, Section 701 et seq., 42 U.S.C. 2000e et seq. ("Title VII").  The law prohibiting discrimination against persons forty years of age and over is the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. Section 633a, as amended.  The same pattern of analysis developed under Title VII has generally been applied to age discrimination cases.  Federal sector equal employment opportunity regulations are set out in 29 C.F.R. Part 1614.

***Disparate Treatment Analysis:***  In order to prevail in a disparate treatment claim, Complainant must satisfy the three-part evidentiary scheme fashioned by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Complainant must initially establish a prima facie case by demonstrating that he/she was subjected to an adverse employment action under circumstances that would support an inference of discrimination.  See Furnco Construction Co. v. Waters, 438 U.S. 567, 576 (1978).  Production of a prima facie case will vary depending on the facts of the particular case.  See McDonnell Douglas, 411 U.S. at 802 n. 13.  The burden then shifts to the Agency to articulate a legitimate, nondiscriminatory reason for its actions.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  To ultimately prevail, Complainant must prove, by a preponderance of the evidence, that the agency's explanation is pretextual, i.e., not the true reason for its actions.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 519 (1993).

***Prima Facie Case:***  The elements of a prima facie case of discrimination are determined by the factual circumstances of the case and the bases of discrimination alleged.  McDonnell Douglas, supra.  Here, the Complainant alleged disparate treatment with respect to her AWOL charge based on race, sex, age, reprisal and disability.

In order to establish a prima facie case of disparate treatment, a complainant must generally show: (1) membership in a protected class; (2) an employment situation comparable to that of other employees not of the same protected class; and, (3) treatment that is different than that experienced by those other employees with respect to the terms, conditions, or benefits of employment.  McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273 (1976); Scott v. Secretary of Defense, EEOC Appeal No. 01902727 (September 24, 1990).

Employees are in comparable employment situations when it is reasonable to believe that they would receive the same treatment in the context of a particular employment decision.  See, Lindemann & Grossman, Employment Discrimination Law, 3rd Ed., Chapter 2, pp. 30-33 (1996).  In order for comparative employees to be considered similarly situated, all relevant aspects of the complainant's situation must be nearly

identical to those of the comparative employees. O'Neal v. Postmaster General, EEOC Request No. 05910490 (July 23, 1991); Powell v. Postmaster General, EEOC Appeal No. 01911979 (November 25, 1991). Thus, in order to be similarly situated, the comparative employees must have dealt with the same supervisor and have been subject to the same standards. Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992).

Even in cases where there are no similarly situated employees, a complainant may be able to establish a prima facie case by showing: (1) membership in a protected class; (2) the occurrence of an adverse employment action; and (3) some evidence of a causal relationship between membership in the protected class and the adverse action. Ward v. U.S. Postal Service, EEOC Request No. 05920219 (June 11, 1992), citing Potter v. Goodwill Industries of Cleveland, 518 F.2d 864 (6th Cir. 1975) and Leftwich v. United States Steel Corporation, 470 F. Supp. 758 (W.D. Pa. 1979).

**Age Discrimination**: In order to prevail in an age discrimination claim under the ADEA, a Complainant must generally show membership in the group of persons protected under the ADEA (*i.e.*, persons age 40 or over); that the Complainant was subjected to an adverse employment action; and that the Complainant was disadvantaged in favor of a younger person because of his or her age. Simpson v. Midland-Ross Corp., 823 F.2d 937, (6th Cir. 1987); Polstorff v. Fletcher, 452 F.2d 17, (D. Ala. 1978) (citing Marshall v. Goodyear Tire & Rubber Co., 554 F.2d 730, (5th Cir. 1977). The younger person need not be outside the protected group, but must be sufficiently younger than the Complainant to permit an inference of discrimination. O'Connor, supra.

**Reprisal**: Title VII prohibits employer actions that are based on a retaliatory motive and are likely to dissuade a reasonable employee or applicant from engaging in protected EEO activity. See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); see also, 42 U.S.C. § 2000e-3(a). Thus, in cases involving reprisal, the criteria for establishing a prima facie case may require a showing that (1) the complainant engaged in a protected activity, (2) management was aware of the complainant's participation in the protected activity, (3) management effected some action which adversely impacted upon the complainant following the protected activity, and (4) the management action followed the protected activity within such a period of time that a retaliatory motive can be inferred. Hochstadt v. Worcester Found. for Experimental Biology, Inc., 425 F. Supp. 318 (D. Mass. 1976), aff'd, 545 F.2d 222 (1st Cir. 1976).

The action required in the third element need not be an ultimate, or even significant, personnel action. Therefore, any action by a management official that is likely to dissuade a reasonable employee or applicant from making or supporting a charge of discrimination is sufficient to satisfy this element of a prima facie case of reprisal. Petty slights, minor annoyances, and simple lack of good manners normally will not create such deterrence. See, Burlington Northern, supra. (finding that an assignment to more arduous and less desirable job duties, even if such duties fall within the scope of the complainant's job description, was likely to dissuade the plaintiff from making or supporting a charge of discrimination). See also, Equal Employment Opportunity Commission Compliance Manual, Vol. 2, Section 8, at 8-13 (Retaliation).

To prevail in a case alleging reprisal, it is sufficient for the complainant to show that his or her protected EEO activity was a motivating factor in the employment action at issue.[2]

**General Harassment Analysis:**   Discriminatory harassment based on age, race, national origin, sex, and reprisal consists of personal slurs or other denigrating or insulting verbal or physical conduct relating to an individual's age, race, sex, national origin, or prior EEO activity.   See, e.g., 29 C.F.R. Section 1606.8 (national origin discrimination).

In cases involving harassment, court and EEOC decisions have modified the McDonnell Douglas analytical approach in order to achieve "a sensible, orderly way to evaluate the evidence."  To establish a prima facie case of harassment, the complainant must show: (1) membership in a protected class; (2) unwelcome personal slurs or other denigrating or insulting verbal or physical conduct ; (3) that the harassment complained of was based on the complainant's membership in the protected class; and (4) that the harassment was sufficiently severe or pervasive to affect a term or condition of employment, and/or that the harassment had the purpose or effect of unreasonably interfering with complainant's  work performance and/or that the harassment had the purpose or effect of creating an intimidating, hostile, or offensive work environment. Compare McGinnis v. Secretary of Defense, EEOC Appeal No. 01902760 (November 15, 1990); Sexton v. U. S. Marine Corps, EEOC Appeal No. 01821475 (August 30, 1983); Cudjoe v. Secretary of the Navy, EEOC Appeal No. 01880743 (June 14, 1988); 29 C.F.R. Section 1604.11 (sexual harassment).

The following factors are pertinent to determining whether a work environment is hostile, intimidating, or abusive: (1) whether the conduct in question is verbal or physical, or both; (2) whether the conduct was repeated, and, if so, how frequently; (3) whether the conduct was hostile or patently offensive; (4) whether the alleged harasser was a supervisor or a coworker; (5) whether more than one person joined in the harassment; and (6) whether the harassment was directed at more than one individual.  King v. Hillen, 21 F.3d 1572 (Fed. Cir. 1994); Crane v. Postmaster General, EEOC Appeal No. 01924585 (April 22, 1993).

For harassment to be considered discriminatory, it must be severe or pervasive.  Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993).  Actual psychological or emotional injury is not required. Harris, supra.  However, unless the conduct is very severe or persistent, a single incident or group of isolated incidents will not be regarded as discriminatory harassment.  See e.g. Scott v. Sears Roebuck and Co., 798 F.2d 210 (7th Cir. 1986); Hansen v. Department of the Air Force, EEOC Appeal No. 01920621 (September 10,

---

[2] The Supreme Court has ruled that an aggrieved individual must show that the alleged retaliatory action would not have occurred "but for" his or her participation in protected EEO activity.  Univ. of Texas Southwestern Med. Ctr. v. Nassar, U.S. No. 12-484 (2013).  However, in the EEOC's view, the Nassar decision does not apply in the federal sector.  Petitioner v. Dep't of the Interior, EEOC Petition No. 0320110050 (July 16, 2014), n.6.  Thus, we continue to evaluate complaints of reprisal using the "motivating factor" standard.

8

1992).   The conduct in question should be evaluated from the standpoint of a reasonable person, taking into account the particular context in which it occurred. Highlander v. K.F.C. National Management Co., 805 F.2d 804 (6th Cir. 1986).

A prima facie case of harassment may be rebutted by the production of evidence to show that: (1) the alleged conduct did not occur; (2) the conduct complained of was not unwelcome; and/or (3) the alleged harassment was not sufficiently severe or pervasive to adversely affect the complainant's employment opportunities, to unreasonably interfere with the complainant's performance, or to create an abusive working environment.

### 2. Discussion

We first discuss the Complainant's allegations of disparate treatment, Claims A through D, using the three-part McDonnell Douglas analysis.   We will then discuss his harassment claim, Claim B.

### a. Disparate Treatment – Claims A through D

#### Prima Facie Case

The above established order of analysis need not be followed in all cases. Where, as here, management has articulated legitimate nondiscriminatory reasons for the employment decisions at issue, the factual inquiry can proceed directly to the third step of the McDonnell Douglas analysis, that is, the ultimate issue of whether Complainant has shown by a preponderance of the evidence that management's actions were motivated by unlawful discrimination. See U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 713-17 (1983); Holley v. Dep't of Veterans Affairs, EEOC Request No. 05950842 (Nov. 13, 1997).   Therefore, this disparate treatment analysis does not include a prima facie case analysis on the bases of age, race, sex, national origin, and reprisal.

#### Agency Response

Regarding Claim A, RS explained that there was no value in retaining the position of Assistant Chief of Staff.  As Chief of Staff, RS was told by HR that it was within his purview to reorganize his office to eliminate or add positions.  He stated that he consulted with HR, which approved of abolishing the position.  He added that in 2011, outside consultants offered suggestions to reorganize the Medical Center because the facility was an "under-performer." Senior leadership was tasked to specifically change inpatient hospital flow and basic clinical operations. This was made a high priority by senior leadership after they received the suggestions from the consultants. (ROI, Tab B-4.)

RS explained that the only way to systematically tackle the problem of hospital flow and the Emergency Department backlog was to recruit a person who could focus almost exclusively on the vital processes of these operations.  He recruited ED from a non-VA

hospital because she had experience in hospital flow, which was the process of getting patients in and out of the emergency room properly. To address the patient flow problem that senior leadership identified, RS created the Associate Chief of Staff of Clinical Operations position. He added that the Assistant Chief of Staff and the Associate Chief of Staff for Clinical Operations were two distinctive positions with different duties and responsibilities. The Associate position specifically required patient flow experience. (ROI, Tab B-4.)

RS also stated that he discussed the elimination of the Assistant Chief of Staff position with the former director prior to his departure. He also stated that did not know ED before the recruitment process for the Associate Chief of Staff position, but she knew the former director, and came to the hospital and met people. He also stated that she was referred to him by a colleague. He denied that the abolishment of the Assistant Chief of Staff position or his reassignment were due to the Complainant's race, age, sex, national origin or EEO activity. (ROI, Tab B-4.)

DH's testimony supports RS's explanation. He added that selectee, ED was appointed to the position because of her expertise in patient flow, which was recommended by the consultants. He added that the Complainant's skills were better suited for Primary Care. He did not feel that the Complainant was discriminated against due to his race, sex, age, national origin, or EEO activity. (ROI, Tab B-5.)

MA confirmed that as interim director, he signed the letter abolishing the Complainant's position and reassigning him to a staff physician position. He explained that he has a general knowledge of the duties of the position but believes that the reassignment was related to clinical quality and that the abolishment of the position was being planned for a long time. He added that that there was no other management position for the Complainant. He further explained that since the position was a direct report to Chief of Staff, RS was the best person to assess if the position was needed. He denied that he discriminated or retaliated against the Complainant. (ROI, Tab B-6.)

Regarding Claim B, RS explained that when the Assistant Chief of Staff position was abolished, the Complainant was no longer responsible for various facility committees. Therefore, he was taken out of the group emails and committees because he was no longer part of management and it was not relevant to his position in Primary Care. He added that he has removed other people from group emails and committees who were taken out of their positions. He denied that the Complainant was discriminated against because of his race, sex, age, national origin or EEO activity. (ROI, Tab B-3.)

DH added that he felt the Complainant did not need to be on the group emails because he was being reassigned to a staff doctor position. These assignments and email groups are for service chiefs or other management positions. Finally, he testified that the removal of Complainant from these committees and groups was not due to his race, sex, age or national origin, or EEO activity. (ROI, Tab B-4.)

Regarding Claim C, DH stated that he revoked the Complainant's tele-commute agreement because as a Primary Care doctor, he needed to be at the facility caring for veterans. Since becoming the director he has looked across the board at tele-commute agreements and alternate work arrangements. He stated that these telework agreements need to serve organizational needs to better serve veterans. DH also stated that he revoked other telework agreements within the facility. (ROI, Tab B-4.)

RS's testimony supports DH's explanation. He stated that DH scrutinized telework agreements when he arrived at the facility. RS does not believe that the Complainant's EEO activity, race, age, sex or national origin were factors regarding Claim C. (ROI, Tab B-3.)

Regarding Claim D, RS stated that he submitted the Complainant's name for a performance award, but DH disagreed with his recommendation. After consultation with DH, RS felt that the Complainant did not go beyond his normal responsibilities and therefore did not warrant a performance award. He added that the Complainant did not exhibit initiative because he felt he was underutilized. He further explained that the Complainant's position was in "transition" and therefore did not warrant performance pay. Although the Complainant received an "Excellent" rating, RS stated that performance ratings and performance pay were different and unrelated. He denied that the Complainant's race, age, sex, national origin, or EEO activity were factors in this decision. (ROI, Tab B-4.)

DH acknowledged that the Complainant received an "Excellent" performance rating. He also stated that the Complainant did not accomplish any more than he was already obligated to perform. DH expressed his doubt about the Complainant's performance pay recommendation and agreed that his performance did not warrant performance pay for fiscal year 2013. (ROI, Tab B-5.)

The foregoing evidence is sufficient to raise a genuine issue of material fact as to whether the Complainant was discriminated against in connection with the matter raised in this complaint. Thus, we find that management met its burden to articulate legitimate, non-discriminatory reasons for its conduct toward the Complainant with respect to this matter. To prevail, the Complainant must show by a preponderance of the evidence that management's explanation is pretext and that management's actions were actually based on discriminatory motives.

### Pretext

The Complainant alleges that RS created a premeditated plan to humiliate and marginalize him with the intent to get rid of his position and create a different position with similar duties so that RS could hire a physician that he liked. The Complainant also alleges that RS wanted to surround himself with younger, white and female physicians, and preselected another physician for the Associate Chief of Staff position. He also stated that after he met with DH to discuss RS's behavior, he was retaliated against because he mentioned that he spoke to an EEO lawyer. The Complainant also provided evidence that

he was the only physician with an "Excellent" performance rating who did not receive performance pay.  He also highlighted inconsistent explanations from RS regarding the abolishment of his position.  To show pretext, a complainant must provide evidence proving management's reasons were factually baseless, were not the actual motivation for its decisions, or were insufficient to motivate its actions.  Balderston v., Fairbanks Morse Engine Div., 328 F.3d 309, 323 (7th Cir. 2003).

*Claims A through C*

Apart from his own assertions, the Complainant offered no evidence of pretext or discriminatory intent for Claims A through C.  Generally, a complainant's testimony alone has been judged inadequate as proof to establish pretext.  Bohrer v. Hanes Corporation, 715 F.2d 213 (5th Cir. 1983), cert. denied, 465 U.S. 1026 (1984).  Furthermore, a complainant's subjective belief that the management action at issue was the result of discrimination is insufficient to prove pretext.  See Bohrer, supra; Elliott v. Group Medical & Surgical Service, 714 F.2d 556 (5th Cir. 1983), cert. denied, 467 U.S. 1215 (1984).

Besides his own statements, and speculation from his witnesses, the Complainant did not offer any direct or indirect evidence that management's actions were due to discriminatory animus or retaliation.  Although he provided a thorough rebuttal to management's testimony, he has not established a nexus between his protected classes and management's actions for Claims A through C.

Regarding the abolished position and creation of the Associate of Staff position, the Complainant cites to the organizational chart to show that the Assistant Chief of Staff position was an official title, and that RS "created [the Associate Chief of Staff] position in a premeditated plan to bring [ED] on board and to abolish [his] position of Assistant Chief of Staff".  However, the Complainant has not established a nexus between any of his protected classes and the abolishment of his position.  The mere fact that ED is a white female who is six years younger is not sufficient to establish pretext.  .

The Complainant also alleges that management officials wanted to abolish his position because they preselected ED to replace him with a new position that was functionally the same as the Assistant Chief of Staff position. He also highlighted inconsistencies in RS's testimony regarding how he first met ED, and how she was recruited for the position.  Further, RS's answers conflicted with the SME regarding the abolishment of the Complainant's Assistant Chief of Staff position and the hiring of ED for the Associate Chief of Staff of Clinical Operations position.  Although RS stated that he worked with the former Chief of HR (who has since retired from federal service) to abolish the Complainant's position, the SME stated that HR was not contacted and that no announcement was made for the new position.  The Complainant also presented contemporaneous handwritten evidence  documenting that the former Chief of HR seemed "surprised" by the abolishment of the Assistant Chief of Staff position when it was announced . (ROI, Tabs B-1, C-1, C-2, C-3, C-6, C-7.)

12

000203

While there are inconsistencies in RS's testimony, without more evidence, his testimony cannot be viewed as establishing that any of the Complainant's protected classes were factors in abolishing his position or hiring ED. As the record is otherwise devoid of evidence to establish a nexus between the abolishment of the position and Complainant's race, national origin, sex, or age, we cannot conclude, based on the facts of this case, that RS's lack of credibility in the above referenced testimony, is probative of pretext. (ROI, Tabs B-4, B-8.)

The Complainant also has not shown that the abolishment of his position was due to reprisal. He stated that the action was the culmination of RS's two-year premeditated plan to undermine the Complainant that began prior to his July 19, 2013, meeting with DH. The fact that this alleged plan occurred before RS knew of the Complainant's discussion with DH about his EEO concerns precludes a finding of pretext based on reprisal. (ROI, Tabs B-1, B-5, C-1.)

The Complainant also alleges that ED was pre-selected for the new position, which is why there was no announcement of the vacancy. However, pre-selection alone does not establish pretext. Jenkins v. Department of the Interior, EEOC Request No. 05940284 (March 3, 1995). Rather, there must be evidence that the pre-selection was motivated by discriminatory animus. Goostree v. State of Tennessee, 796 F.2d 854, 861 (6th Cir. 1986). It is not unlawful under Title VII to favor someone who the employer believes will perform the job better, or to be motivated by favoritism so long as the employer was not motivated by prohibited considerations. Holder v. City of Raleigh, 867 F.2d 823, 825 (4th Cir. 1989); Benzies v. Illinois Dept. of Mental Health and Developmental Disabilities, 810 F.2d 146, 148 (7th Cir. 1987). Therefore, even if ED was pre-selected for the position, it is not sufficient to establish pretext.

Regarding his revoked telework agreement, the Complainant offered no evidence of any similarly situated individuals who were allowed to keep their telework agreements after being transferred to primary care positions. Furthermore, he offered no evidence to refute management's explanation that since he was reassigned to a primary care role, he had to be in the hospital to provide care to patients. He has also offered no evidence to refute management's explanation that he was removed from various email groups because he was no longer part of management. (ROI, Tab B-1, B-5.)

For the foregoing reasons, we find that the Complainant failed to show by the requisite legal standard that management's explanation is pretext and that management's conduct was actually based on prohibited discriminatory motives in regard to Claims A, B, and C.

Our finding that the complainant has not sustained his burden of persuasion is not an endorsement of the reorganization or telework decisions, but reflects the limited focus of our inquiry. Title VII does not protect against unfair business decisions, but only against decisions motivated by an unlawful animus. Turner v. Texas Instruments, Inc., 555 F.2d 1251 (5th Cir. 1977). To paraphrase the Burdine court, supra, the fact that a complainant may think that management inadequately considered the Complainant's qualifications and accomplishments, or that the reorganization, revoked telework, and

denied performance pay were carried out arbitrarily, does not in itself create Title VII liability.  See also, St. Peter v. Secretary of the Army, 659 F.2d 1133, 1138 n.5 (D.C. Cir. 1981).

It is not a function of the EEO process to restrain management's employment decisions or to substitute another judgment for that of the deciding official.  We cannot second-guess management's personnel decisions absent a demonstrably discriminatory motive. Loeb v. Textron, Inc., 600 F.2d 1003 (1st Cir. 1979).  In this case there is insufficient evidence of such a motive.

*Claim D – Denied Performance Pay*

Regarding the denied performance pay, we find that the Complainant establishes by a preponderance of the evidence that he was retaliated against for his protected activity after DH and RS were officially notified of this EEO complaint on or about November 1, 2013. For fiscal year 2013, the Complainant received an "Excellent" rating, as he did the previous six years.  He received performance pay for each of those years, which, according to RS, had to have been paid by March of the following year.  However, RS and DH did not award the Complainant performance pay for 2013, even though he received an "Excellent" rating.

We find that DH's explanation for not awarding the Complainant performance pay for 2013 lacks credibility.  DH stated that after RS recommended the Complainant for performance pay, he asked RS to "justify" the award.  DH stated that RS was not convincing, and that RS and he both agreed that the Complainant did not "go beyond his normal duties" to warrant performance pay.  He stated that he questioned other doctors' performance awards, which led to them also having their performance pay reduced or not granted, but did not state whether these doctors had "Excellent" reviews.  However, SL testified that out of 267 physicians with "Excellent" ratings, the Complainant was the only one not to receive performance pay for 2013. We find that this is probative evidence that the Complainant was retaliated against and casts doubt on management's explanation for denying him performance pay.  (ROI, Tabs B-1, B-4, B-5, B-8.)

Furthermore, DH stated that since the Complainant was being "transitioned" to a new position, he was not eligible for performance pay.  However, the "transition" only occurred six days prior to the end of the fiscal year.   As indicated by DH and RS's testimonies, performance pay is based on performance for the past year, and not for prospective performance.

Management also stated that performance pay was unrelated to performance evaluations.  However, there is no evidence that any of the performance standards were changed from the year before.  Even if the Complainant's performance standards were changed by DH, there is no indication that the changes were communicated to the Complainant.

14

We also note that the Complainant was eventually awarded $8,750 in performance pay in April 2014. However, on April 7, 2014, the Complainant was told by HR that he was not awarded performance pay for 2013. When considered with RS's statement that all 2013 performance pay must be paid out by March 2014, and DH's statement that the Complainant did not deserve performance pay, we find that this 'delay' cannot be attributed to mere oversight. Moreover, under the broad standard of reprisal, even though Complainant received his performance pay within a short time after it was due, this type of action would certainly dissuade a reasonable person from engaging in the EEO process. We note also that the record suggests that the eventual performance pay award was likely in response to the Complainant's amendment of his complaint, and that he was initially denied the award in March 2014. (ROI, Tab B-1, B-4.)

For these reasons, and based on the entirety of evidence in the record, we find that the Complainant establishes by the preponderance of the evidence that he was retaliated against for his EEO activity when he was initially denied performance pay.

### b. Harassment – Claim E

We find that each of the events cited in Claim E occurred as alleged by the Complainant. There is no material dispute regarding these events. However, as an initial matter, we find that incidents 4, 5, and 8, addressed as Claims A through C, above, may not properly be considered as part of this harassment claim, given our determination that the actions were not motivated by discriminatory animus. See Oakley v. U.S. Postal Serv., EEOC Appeal No. 01982923 (Sept. 21, 2000). See Epting v. Department of Veterans Affairs, EEOC Appeal No. 0120112534 (September 13, 2013).

Next, in evaluating whether or not the conduct at issue is harassing in nature, we note that aside from the denied performance pay, most of the events cited by the Complainant as evidence of harassment concern common workplace events and management decisions. He cites to seven events that include several management actions such as a delayed travel approval, appointment of other physicians to serve as Acting Chief of Staff, revocation of a parking sticker, office relocation, and denied performance pay, as evidence of harassment.

Harassment consists of conduct which is not job-related, which is hostile or abusive, which is inappropriate in the work environment, and which is unnecessary to the proper functioning of the work unit. Examples of harassment include epithets, slurs, negative stereotyping, gestures or other actions which are threatening, intimidating, or hostile, physical abuse, racial or ethnic jokes, and written or graphic material that is posted or circulated in the workplace and which denigrates or shows hostility or aversion toward an individual or group. Harassment does not consist of dissatisfaction with a supervisor in connection with job-related matters, job-related events that an employee finds merely objectionable, normal stress associated with work, or the belief that job-related events are "harassing" in nature because they are motivated by discriminatory intent or bias.

Here, the Complainant's allegation of harassment, with the exception of the denied performance pay, consists solely with his dissatisfaction with management's job-related decisions, or common workplace interactions. His belief that management's decisions may be based on discriminatory factors does not transform those decisions into harassment.   Where, as here, the conduct at issue consists of job-related management conduct, it is unnecessary to review that conduct as harassment merely because the Complainant has so labeled it.   As discussed above, they are routine workplace actions, and are a proper function of the office.

Furthermore, the Complainant has not shown that the conduct is sufficiently severe or pervasive to create an objectively hostile work environment.   Viewing the alleged harassing conduct under the King/Crane factors, we find that the Complainant failed to show that it was sufficiently severe or pervasive to constitute an objectively hostile work environment.  Failure to achieve an ideal work environment does not violate Title VII. As the Supreme Court has stated, Title VII is not intended to be a "general civility code for the American workplace....Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion]...because of...sex." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998).

Furthermore, under federal EEO law, discriminatory harassment must be more than disagreements, interpersonal friction, or events that merely result in hurt feelings. "Harassment, as the term is used in Title VII cases, refers to more than being subjected to stress."  Lin v. U.S. Postal Service, EEOC Appeal No. 01932880 (December 23, 1993).  In coming to our conclusion, we considered our finding that DH and RS retaliated against the Complainant by not awarding him performance pay for fiscal year 2013.  However, we find that this sole event is not severe enough to be considered harassment.   Accordingly, we find that the Complainant has failed to show that even viewed all together, the alleged incidents created conditions that were severe or pervasive, sufficient to create a hostile work environment.  See Harris, supra.

Based on the foregoing discussion, we find that the Complainant was not subjected to harassment within the meaning of federal EEO law.

## CONCLUSION

The Complainant established by the preponderance of the evidence that management officials retaliated against him for his EEO activity when he was initially denied performance pay (Claim D).  The Complainant fails to establish by a preponderance of the evidence that he was discriminated against for the remaining claims.

## REMEDIAL RELIEF

In view of the above finding of reprisal, we order the following relief and corrective action.

### 1.  EQUITABLE RELIEF

Pursuant to 29 C.F.R. Section 1614.501(a)(5), the agency will commit to the Complainant in writing that it will cease from engaging in the unlawful employment practice found in this case, namely, reprisal, that it will not engage in similar unlawful employment practices, that it will provide the Complainant a workplace free from hostility, offensive conduct or abuse, and that no reprisal will be taken against the Complainant for filing and pursuing this or any other complaint under federal EEO law.

### 2.  Compensatory Damages

The Department is liable for losses caused by the discrimination which occurred in this case.  Although the Complainant did not specifically request compensatory damages, the evidence reasonably raises the possibility that the Complainant suffered losses which other forms of relief may not cover.  However, there is insufficient evidence in the record from which to determine whether, or to what extent, the Complainant has incurred pecuniary or non-pecuniary losses due to the discrimination.  Accordingly, we defer a decision on the specific amount of damages to be awarded pending receipt of a supplemental investigation report on the issue of damages.

Briefly, the Complainant must provide <u>verifiable</u>, <u>objective</u> evidence that (1) he incurred the damages <u>and</u> (2) that the damages resulted from the discrimination.   A mere statement that the complainant deserves compensation for embarrassment, humiliation, lack of sleep, emotional distress, anxiety, etc., without supporting evidence, is not sufficient.  Compensatory damage claims must be accompanied by evidence of both the injury or loss that was incurred <u>and</u> the connection between the injury or loss and the discriminatory conduct.

Compensatory damages may be claimed for past pecuniary losses, future pecuniary losses, and non-pecuniary losses.  *Past pecuniary losses* are monetary or out-of-pocket expenses, such as medical, moving, or job search expenses, which the complainant has already incurred as a result of the discriminatory conduct.   Evidence of such damages must establish two elements.   First, the amount of the damages must be established through objective evidence such as bills, receipts, or canceled checks. Second, the evidence must establish the causal relationship between the discriminatory conduct and the alleged damages.   *Future pecuniary losses* are out-of-pocket expenses, such as medical care or counseling, which will be incurred in the future because of the discriminatory conduct.  Evidence of such damages usually requires expert testimony, and must establish three elements: (1) the likelihood of future expenses; (2) the approximate amount of future expenses; and (3) the causal relationship between the discriminatory conduct and the future expenses.   *Non-*

17

*pecuniary losses* are non-monetary harms or injuries, which are impossible to quantify exactly, such as pain and suffering, or loss of enjoyment of life. Evidence of non-pecuniary losses must show the nature, duration, severity, and cause of the claimed injury.

In accordance with guidance set forth in <u>Broughton v. U.S. Postal Service</u>, EEOC Appeal No. 01951999 (April 25, 1995), the Complainant is further advised as follows concerning claims of compensatory damages.

1. The Complainant should submit objective evidence such as statements concerning emotional pain or suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character or reputation, injury to credit standing, loss of health, and any other non-pecuniary losses that the Complainant believes were incurred as a result of the discriminatory conduct. Such statements shall include a statement from the Complainant describing and itemizing <u>in specific detail</u> the claimed damages.

2. The Complainant may submit statements from credible witnesses, including family members, friends, health care providers, and other counselors (including clergy) describing the damages incurred and the types of treatments and/or medications prescribed. Such statements may address, for example, the outward manifestations or physical consequences of emotional distress, including anxiety, sleeplessness, stress, depression, marital strain, fatigue, or a nervous breakdown. In order for these statements to be acceptable as evidence, these witnesses must indicate that (a) <u>their statements are based on personal knowledge obtained through their own observations</u>, (b) must include <u>specific, detailed</u> information on the <u>physical and/or behavioral manifestations</u> of the pain, distress, anguish, etc.; (c) must include <u>information on the duration</u> of the distress or anguish (i.e., when did they first notice these manifestations and how long did these manifestations last; (d) must include specific <u>examples</u> of how the distress, anguish, etc., affected the complainant day to day, both on and off the job; and (e) must indicate the types of medication and/or treatment prescribed, if applicable.

3. Objective evidence also may include proof of the Complainant's actual out-of-pocket expenses (bills, receipts, etc.) related to medical treatment, counseling, medications, and so forth, that are directly related to or caused by the discrimination. If reimbursement is claimed for other types of losses or expenses, the Complainant must provide credible evidence, such as bills, receipts, canceled checks or

other verifiable evidence indicating the exact nature and date(s) of the loss and/or expense.

4. The Complainant must establish a connection between the discriminatory action and the alleged harm resulting or injury. Hence, any evidence of medical expenses should include medical documentation such as statements from medical or other health care professionals who have treated the loss or injury claimed. If the medical condition existed prior to the discrimination, the Complainant must submit medical or other credible evidence indicating whether or not the condition worsened as a result of the discrimination, the length of time the Complainant had the condition prior to the discrimination, the type of medical treatment the Complainant received for the condition, and who provided the treatment. Evidence regarding other types of losses or expenses must also indicate (a) the exact nature of the loss or expense, (b) the date(s) of the loss, and (c) any other information that proves that the loss or expense occurred as a result of the alleged discrimination.

5. A request for compensatory damages may require the Complainant to disclose personal and sensitive information to the agency to enable the agency to determine whether the claimed harm or injury is linked in whole or in part to the discriminatory conduct.

This office has requested the Department's Office of Resolution Management (ORM) to conduct a supplemental investigation in order to obtain any additional information needed to reach a just and proper determination of the amount of damages to be awarded. Upon receipt of this decision, the Complainant shall have forty-five (**45**) days in which to provide the ORM investigator with any and all objective evidence, as described in the preceding paragraphs, pertinent to compensatory damages. The ORM investigator will contact the Complainant to obtain this evidence. Thereafter, based on the record, the evidence provided by the Complainant, and any additional evidence gathered in the supplemental investigation, this office will issue a final agency decision on damages. The decision will advise the Complainant of the right to appeal the decision to the EEOC and the right to file a civil action.

If the Complainant wishes to negotiate a settlement of the damages award with the facility director or staff office head, rather than having this office decide it, the Complainant should simultaneously submit the above requested information regarding damages both to the ORM investigator and the facility Director or staff office head, or that official's legal representative. Any such agreement must be reached prior to the issuance of a final agency decision by this office. The Department will not delay investigation and issuance of a decision on damages because of settlement negotiations unless the Complainant requests an extension of time in writing.

### 3. Attorney's Fees

The record in this case does not indicate that Complainant is currently represented by an attorney. However, the record may be incomplete, or Complainant may have recently retained an attorney to assist in the further processing of the complaint. Therefore, we provide the following information concerning claims for attorney's fees and costs.

Any claim for fees must include a verified statement from the attorney of costs and attorney's fees. The statement must be accompanied by an affidavit from the attorney itemizing the charges for legal services. Specifically, the affidavit should chronologically detail the dates on which services were rendered, the person providing such services, the nature and extent of the services performed, and the number of hours expended. This affidavit is only a reconstruction of the services provided and does not, in itself, justify an award of attorney's fees. To be compensable, such services must be documented by contemporaneous billing records prepared the same day on which the services were actually provided. Consequently, copies of the applicable billing records must accompany both the affidavit and verified statement.

In addition to the above information, the affidavit must contain a statement as to the attorney's usual and customary hourly charge, as well as the usual and customary hourly charge for each person who worked on this case. It should, to the extent applicable, explain any distinction between in court and out of court fees, whether the fee was fixed or contingent, the nature and length of the professional relationship with this complainant, and any other factors which might affect the amount of attorney's fees in this case. The affidavit must describe the training and experience of each person who worked on this case, and the date of bar membership as applicable.

The claim should also include affidavits from other attorneys attesting to the prevailing market rate in the relevant geographic area for similar services, and any evidence regarding hourly rates that have been awarded in prior cases. It is the attorney's responsibility to prove the reasonableness of the requested hourly rate. The claim for fees <u>must</u> include a copy of the fee agreement between counsel and the complainant.

Finally, the claim must include any documentation (bills, receipts, statements, invoices, express or certified mail receipt numbers, delivery service documents, *etc.*) to support any charges for costs billed to the complainant. Failure to provide adequate documentation may result in denial of the claimed costs.

Except as noted below, EEOC's regulations permit payment of an attorney fee award only for services performed <u>after the filing of the formal, written complaint,</u> <u>and</u> <u>after notification to the agency that the complainant is represented by an attorney</u>. However, the regulations do permit compensation for services rendered prior to such notification for a reasonable amount of time spent deciding whether to represent the complainant. In addition, the regulations permit compensation for services rendered prior to the filing of a complaint where an EEOC administrative judge issues a decision finding

discrimination, the Department issues an order that does not implement the decision, and EEOC upholds the administrative judge's decision on appeal.

Any claim for fees and costs must be submitted <u>both to this office</u> **and** <u>to the VA facility director or staff office head, or that official's legal representative</u>, within **30 days** of receipt of this decision. The submission to this office must indicate that a copy of the claim was served on that official or legal representative. This office will issue a final fee decision within 60 days of receipt of the claim, <u>provided</u> a copy of the claim has been served on the above official. The final fees decision will include notice of the right to appeal the decision respecting the amount of the attorney fee award.

If the Complainant wishes to negotiate a settlement of the attorney's fee award <u>with the facility director or staff office head</u>, rather than having this office decide it, such an agreement must be reached <u>prior</u> to the issuance of a final agency decision by this office. This office will not delay issuance of a decision on attorney's fees because of settlement negotiations unless the Complainant's attorney files a written request for an extension of time with this office.

## 4. COSTS

The Complainant is entitled to costs associated with the prosecution of this claim. The costs may include mailing, photocopying, and any other reasonable out-of-pocket expenses. A claim for costs must be filed with this office within **60** days of receipt of this decision. The claim <u>must</u> itemize the costs and be accompanied by documentary evidence (such as bills and receipts) to support the claim. Failure to provide such documentation will result in denial of the claim.

## 5. OTHER CORRECTIVE ACTION

In addition to making the Complainant whole, a remedy must be tailored to correct the particular source of the identified discrimination and to minimize the chance of its recurrence. Therefore, pursuant to 29 C.F.R. Section 1614.501(a)(2), the agency will take whatever corrective, curative, and preventive actions and will adopt whatever measures are necessary to ensure that violations of federal EEO law similar to those found in this case do not recur.

To this end, the agency shall provide responsible management officials (RMOs) RS and DH with EEO training for a minimum of <u>eight</u> hours regarding the prevention and elimination of unlawful retaliation for engaging in protected EEO activity in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, <u>et seq.</u>[3]

This training is mandatory and shall be provided by an ORM subject matter expert. It must be completed within 60 days of the date of this order. It may be completed in either one eight-hour session or increments of two hours or four hours. If an ORM

---

[3] Although MA and PO were also named RMOs in this case, there is no evidence that links them to the initial denial of Complainant's performance pay.

trainer is unavailable, ORM will provide the training content, and the trainer identified by the facility must be certified by ORM as an EEO subject matter expert.

The agency should also consider taking disciplinary action against the above-referenced management officials.  Such action may include, counseling, issuance of an admonishment or a reprimand, suspension, and/or other disciplinary action that the agency considers appropriate under the circumstances.   Training is not considered disciplinary action.

The agency shall post at its Philadelphia facility copies of the attached Notice to Employees (Notice) regarding unlawful discrimination in violation of Title VII.   The agency shall post copies of the Notice, after being signed by the agency's duly authorized representative, within 30 days of the date of this order.  It shall remain posted for at least 60 consecutive days in conspicuous places, including those where notices to employees are customarily posted.  The agency shall take reasonable steps to ensure that copies of the Notice are not altered, defaced, or covered by any other material.

An appropriate management official shall sign and conspicuously post at the facility the attached notice of violation for a period of not less than 90 days.

## RIGHT OF APPEAL

Within 30 days of receipt of this final decision, the complainant has the right to appeal it to:  **Equal Employment Opportunity Commission, Office of Federal Operations, P.O. Box 77960, Washington, D.C. 20013**.  If an appeal is filed, EEOC Form 573 should be used.  A copy of EEOC Form 573 is attached.

A copy of the appeal to the EEOC **must** also be sent to the VA Office of General Counsel at the following address:  **Department of Veterans Affairs, Office of the General Counsel (024), 810 Vermont Ave., N.W., Washington, D.C. 20420**.

Statements or briefs in support of the appeal **must** be submitted to the EEOC within 30 calendar days of the filing of the appeal.  A copy of any such statement or brief, including any statements made on EEOC's "Appellant Docketing Statement", must also be sent to the VA's Office of General Counsel at the above address.

If an appeal is filed with the EEOC, the appeal, and any subsequently filed statement or brief, **must** contain a statement certifying the date and method by which copies of these documents were served on the VA's Office of General Counsel.

If the complainant files an appeal with the Commission beyond the above-noted time limit, the complainant should provide the Commission with an explanation as to why the appeal should be accepted despite its untimeliness.  If the complainant cannot explain why timeliness should be excused, the Commission may dismiss the appeal as untimely.

22

## RIGHT TO FILE A CIVIL ACTION

The complainant also has the right to file a civil action in an appropriate United States District Court. The complainant may file a civil action

within 90 days of receipt of this final decision if no appeal to EEOC has been filed; or

within 90 days after receipt of the EEOC's final decision on appeal; or

after 180 days from the date of filing an appeal with the EEOC if there has been no final decision by the Commission.

The complainant **must** name the person who is the official head of the Department of Veterans Affairs as the defendant. Department means the national organization, and not just the local office, facility, or unit in which the complainant works. The complainant may not name just the Department. The complainant must name **Robert A. McDonald** as the defendant. The complainant must also state the official title of the Department head. The official title of the head of the Department of Veterans Affairs is **Secretary of Veterans Affairs**. Failure to provide the name or official title of the head of the Department may result in dismissal of the case.

If the complainant decides to file a civil action under Title VII (discrimination due to race, color, religion, sex, national origin, or reprisal) or under the Rehabilitation Act of 1973, as amended, (discrimination due to disability), and if the complainant does not have or cannot afford the services of an attorney, the complainant may request that the Court appoint an attorney to represent the complainant and that the Court permit the complainant to file the action without payment of fees, costs, or other security. **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend the time in which to file a civil action. Both the request and the civil action MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS of the date the complainant receives the final decision from the Department or the Commission.

_____        _____
                                                                      Date

MAXANNE R. WITKIN
Director, Office of
Employment Discrimination
Complaint Adjudication

Attachment: EEOC Form 573

## NOTICE TO EMPLOYEES

This Notice is posted pursuant to a recent Final Agency Decision issued by the Office of Employment Discrimination Complaint Adjudication (OEDCA), which found that a violation of Title VII occurred at this facility.

Federal law requires that there be no discrimination against any employee or applicant because of the person's RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE OR PHYSICAL or MENTAL DISABILITY with respect to hiring, firing, promotion, compensation, or other terms, conditions or privileges of employment. Federal law also prohibits REPRISAL against employees who participate in EEO proceedings or otherwise oppose unlawful discriminatory employment practices.

The Department of Veterans Affairs Medical Center in Philadelphia, Pennsylvania, supports and will comply with such Federal law and will not retaliate against individuals because they have exercised their rights under law.

The Department of Veterans Affairs Medical Center in Philadelphia, Pennsylvania, has remedied the discrimination found in OEDCA's Final Action or Decision.   The Department of Veterans Affairs Medical Center in Philadelphia, Pennsylvania, will ensure that officials responsible for personnel decisions and terms and conditions of employment will abide by the requirements of all federal equal employment opportunity laws and will not retaliate against employees who file EEO complaints.

The Department of Veterans Affairs Medical Center in Philadelphia, Pennsylvania, will not in any manner restrain, interfere, coerce, or retaliate against any individual who exercises his or her right to oppose practices made unlawful by, or who participates in proceedings pursuant to, Federal equal employment opportunity law.

_____

Signature of Appropriate Management Official

Date Posted:_____

Posting Expires:_____

**CERTIFIED MAIL**

OOD
Agency Case No. 200H-0642-2013104692

Mukesh Jain
12 Magnolia Court
Succasunna, NJ   07876

Dear Mr. Jain:

Enclosed is a copy of the Department's final agency decision concerning the above referenced complaint.

The final decision concludes that you were retaliated against when you were initially denied performance pay for fiscal year 2013. The relief to which you are, or may be, entitled is explained fully in the "Remedial Relief" section of the enclosed decision. The Director of the facility where the discrimination occurred has been notified of this final decision and instructed to implement the relief and corrective action ordered in the decision.

If you are dissatisfied with this final decision, you may appeal in accordance with the statement of appeal rights contained in the decision. Also enclosed is EEOC Form 573 for use if you wish to file an appeal.

Sincerely yours,

MAXANNE R. WITKIN
Director

Enclosures

12/12/2016

000216

OOD

Network Director (VISN 4)
Department of Veterans Affairs
323 North Shore Drive Suite 400
Pittsburgh, PA 15212

SUBJ: Final Agency Decision – Mukesh Jain
      Agency Case No. 200H-0642-2013104692

1. Enclosed are copies of the Department's final agency decision on the above complaint and our letters transmitting the decision to the Complainant.

2. As indicated in the enclosed decision, we have concluded that the Complainant was discriminated against with respect to the issues raised in the complaint. Accordingly, the Complainant is entitled to the equitable and other relief specified in the *Remedial Relief* section of the enclosed decision. You must implement the *Equitable Relief* and *Other Corrective Action* within 30 days of receipt of this decision. You must also provide the complainant with a written determination regarding that relief. Upon completion of the above actions, you must file a compliance report with the Deputy Assistant Secretary, Office of Resolution Management/Office of Policy and Compliance (08B), describing the steps taken to implement the relief awarded in this decision.

3. If you need assistance or have questions regarding implementation of such relief, you should contact the Office of Resolution Management's field EEO Officer or the Compliance Officer in ORM's Office of Policy and Compliance (08B).

4. As for attorney's fees and compensatory damages, this office will issue, at a later date, a separate final agency decision determining the amount, if any, to be awarded. The amount of attorney's fees awarded will be based on evidence submitted to us by the Complainant's attorney, if he has retained one. The amount of compensatory damages awarded will be based on evidence submitted by the Complainant as well as evidence gathered by means of a supplemental investigation. You will be responsible for payment of any such awards.

Page 2

5.  You may negotiate a settlement agreement with the Complainant provided we have not yet issued a final agency decision concerning the awards.  If you wish to negotiate such an agreement, you should seek advice and assistance from the Regional Counsel. We have requested the Complainant to provide you with a copy of the evidence submitted to this office in support of the attorney's fee and compensatory damages claims for your use should you wish to negotiate a settlement.

6.  If you wish to settle the amount of the award, you must do so as quickly as possible. This office will not delay issuance of a final agency decision because of pending settlement negotiations unless the Complainant submits a written request by fax to this office specifying the length of the requested delay.  If you do negotiate an agreement, you must notify this office <u>immediately</u> by faxing us a copy of the signed agreement. Our fax number is (202) 495-5912.

7.  The Department has no right of appeal from this final agency decision.

MAXANNE R. WITKIN
Director

Enclosures

cc: Office of Regional Counsel
    Department of Veterans Affairs
    Medical Center
    3900 Woodland Avenue
    Philadelphia, PA 19104

OOD

Department of Veterans Affairs
Office of Resolution Management (08E)
151 Knollcroft Road, Building 16
Lyons, NJ  07939

SUBJ: Final Agency Decision – Mukesh Jain
      Agency Case No. 200H-0642-2013104692

1.     Enclosed are copies of the Department's final agency decision on the above complaint and our letters transmitting the decision to the Complainant.

2.     We have already provided a copy of our final decision to the facility director.

3.     Please enter the appropriate disposition data in the ORM database.

MAXANNE R. WITKIN
Director

Enclosures

**DEPARTMENT OF**                           **MEMORANDUM**
**VETERANS AFFAIRS**

**DATE:**

**FROM:**    Director, Office of Employment Discrimination Complaint Adjudication
             (00D)

**SUBJ:**    Request to Monitor Compliance – *Mukesh Jain*
             ORM Case No. 200H-0642-2013104692

**TO:**      Deputy Assistant Secretary for Resolution Management/Office of Policy
             and Compliance (08B)

1.      Attached is a copy of our final agency decision in the above-referenced
complaint.   As noted therein, we found that the Complainant was retaliated against
when agency officials initially denied his performance pay for fiscal year 2013.

2.      The remedial relief awarded to the Complainant is noted in the attached decision.
We have provided the Director of the facility where the discrimination occurred with a
copy of the decision.  We have ordered that official to implement the equitable relief
award and other corrective action within 30 days of receipt of the decision, and
recommended that other preventive action be considered with respect to the officials
responsible for the discrimination.

3.      We have also advised that official to file a compliance report with your office
immediately upon completion of the steps taken to implement the relief.  Please monitor
this matter to ensure compliance with the equitable relief and corrective action awarded
or ordered in our decision that does not involve discipline.

Maxanne R. Witkin

Attachment

# DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

**DATE:**

**FROM:**  Director, Office of Employment Discrimination Complaint
Adjudication (OOD)

**SUBJ:**  Request for Investigation of Compensatory Damages Claim
Mukesh Jain, ORM Case No. 200H-0642-2013104692

**TO:**  Director, Office of Policy and Compliance (08B)

1.   Please investigate the compensatory damages claim relating to the above-referenced matter.

2.   We have, this date, advised the Complainant in the "Remedial Relief" section of the attached final agency decision of the type of evidence that he must submit with the claim to prove entitlement to damages. We have directed the Complainant to provide that evidence directly to the assigned investigator within 45 days of receipt of our decision. The investigator should contact the Complainant immediately to obtain that evidence.

3.   To prepare for the investigation, the assigned investigator should first review the law summary and "Damages Checklist" contained in Chapter XVII of OEDCA's manual entitled *A Guide to Investigating Employment Discrimination Complaints*. After examining the evidence submitted by the Complainant, the investigator should obtain affidavits, records, bills, receipts, reports, and other documents from the Complainant, facility officials, and other witnesses who might have information relevant to the complainant's evidence.

4.   The investigator should obtain an affidavit from the Complainant to supplement evidence provided by the Complainant in support of his claim for damages. The investigator should use the "Damages Checklist" contained in the above-referenced manual when interviewing the Complainant. The investigator should obtain detailed responses and dates to any items in the checklist that apply to the Complainant, and should follow up with additional related questions that might become apparent depending on the information provided by the Complainant.

Page 2

Director, Office of Policy and Compliance (08B)

5.     In addition to interviewing the Complainant, the investigator should obtain affidavits from other witnesses, if any, who may have knowledge of the injuries or losses claimed by the Complainant (*e.g.*, co-workers and others in a position to have observed the complainant, individuals identified by the Complainant as having knowledge of the injury or loss, *etc.*)   In addition, the investigator should notify the facility of the investigation, advise them of the specific damages being alleged and the evidence being offered to prove those damages, and provide them with an opportunity to submit any evidence they may have regarding the claim.   Such evidence might include leave records, testimony of agency employees who might have information regarding the Complainant's claims, medical or psychological exams administered by VA or non-VA personnel; applications for worker's compensation or disability retirement, *etc.*, consistent with *Privacy Act* restrictions.   Any such evidence should then be made available to the Complainant for an opportunity to clarify or explain the evidence.

6.     With regard to records that might be protected by the *Privacy Act* or other similar statutes (*e.g.*, health records, disability retirement applications, worker's compensation claims, *etc.*), the best approach for the investigator is to first identify those records available at the facility that might be relevant to the claim.   Then, the investigator should request the Complainant to consent in writing to their release by the facility to the investigator to be used solely for purposes of investigating this claim.   If the Complainant refuses to consent to release of the documents, and facility officials believe they lack authority to release the information without such consent, the investigator should specifically note in his or her investigation report that the Complainant refused to consent to release of the evidence.

7.     Submit a copy of your Report of Investigation to OEDCA within 75 days of your receipt of this letter, along with a request for a final agency decision on the damages claim.   Submit a copy of the report and your request for an FAD to the Complainant. This report should not include a "legal analysis" as is done in regular investigation reports.   Instead, the report should merely contain a summary of all of the evidence obtained by the investigator that bears on the damages claim, along with exhibits containing the affidavits and other documentary evidence upon which the report is based.   If medical or other similar records are included as exhibits, the exhibits should be limited to only those documents from the record relevant to the claim.

Maxanne R. Witkin

Attachment

# Department of Veterans Affairs

# Memorandum

Date:

From:  Director, Office of Employment Discrimination Complaint Adjudication (00D)

Subject:  Decision Finding Discrimination *in re* Mukesh Jain

To:  Interim Under Secretary for Health (10A2A5)

1.  For your information, we are enclosing a copy of the final decision concerning the discrimination complaint filed by the above-referenced individual.

2.  We have already advised the facility director to implement the remedial relief ordered in the decision or order.

MAXANNE R. WITKIN

Attachment(s)

PLE:mec:11/10/14                    JAIN            200H-0642-2013104692
                                      12/12/2016                              000223

Department of Veterans Affairs
Office of Resolution Management (08N)
Central Plains Operations
2002 Holcombe Boulevard
Building 110
Houston, TX 77030

SUBJ:     Request ORM Review of Evidence Submitted *Ex Parte* to OEDCA
          ORM Case No. 200H-0642-2013104692, *Mukesh Jain*

1.     Enclosed is unsolicited documentary evidence sent directly to OEDCA by the complainant concerning a complaint that is currently before this office for a final agency decision.

2.     As this evidence constitutes *ex parte* communication, we are unable, at this point, to consider it. We have briefly examined it only to the extent necessary to determine that the evidence was not included in the investigative file provided to us and that it may relate to issues in the above complaint.

3.     Because this evidence could be relevant and material, and to ensure fairness to all parties, we are submitting this evidence to you and requesting that you conduct the following inquiry:

      a.     Review the material to determine if it is, in fact, reliable evidence that is relevant to the issues in the above complaint and that should be included in the investigative file.

      b.     If you determine that the evidence should be included, you should first provide the other party to the complaint an opportunity to respond, as appropriate. You should then return the evidence, and the other party's response, if any, to this office indicating that the additional evidence: (i) has been included in ORM's official record of the complaint, and (ii) should be considered by us, along with other evidence already in the file.

      c.     If you determine that the evidence should <u>not</u> be included in the investigative file, advise us of that fact, explaining in sufficient detail why you believe the evidence is not relevant or otherwise appropriate for inclusion in the record, and return the material to the party that submitted it with a written explanation.

4.     We have retained the copy of the investigative file provided to us. Upon receipt of your response, we will issue a final agency decision.

MAXANNE R. WITKIN
Director

Enclosure

# MEMORANDUM

**DEPARTMENT OF
VETERANS AFFAIRS**

**Date:**

**From:**   Director, Office of Employment Discrimination Complaint Adjudication (00D)

**Subj:**   Notification of Finding of Intentional Discrimination
**DECISION DOCUMENT – VAIQ Workflow #7442505**

**To:**   Chief of Staff (00A)

1.   Section 102(a)(1) of the Veterans' Benefits Act of 1997, Public Law 105-114, (38 U.S.C. § 319(c)), requires that I report instances of retaliation and, as interpreted, intentional discrimination to the Secretary or Deputy Secretary.  The same section also requires the Secretary or Deputy Secretary to take appropriate action upon receipt of my report.

2.   Pursuant to this requirement, I am reporting such a violation in the case of *Mukesh Jain v. Secretary, Department of Veterans Affairs* (VA Case No. 200H-0642-2013104692).  Copies of my final decision, along with the above-cited section of the Act, are attached.

3.   We have deferred a decision on the amount of monetary award pending receipt of a supplemental investigation report on the issue of damages.

4.   Please sign the attached memorandum to the Under Secretary for Health.  The memorandum summarizes the reasons for my decision and instructs the Under Secretary to ensure that appropriate action is taken concerning the official responsible for the violation.  I have already provided the facility Director with a copy of my decision.

Maxanne R. Witkin

Attachments

MEMORANDUM FOR THE UNDER SECRETARY FOR HEALTH

SUBJECT:   Finding of Discrimination at the VA Medical Center, Philadelphia, Pennsylvania

On November 18, 2014, in the case of *Mukesh Jain v. Secretary, Department of Veterans Affairs* (VA Case No. 200H-0642-2013104692), the Director, Office of Employment Discrimination Complaint Adjudication (OEDCA), issued a final decision finding that the complainant was subjected to unlawful discrimination because of his disability.

The Director, OEDCA, advises me as follows:

- The Complainant told DH, the facility director, that he spoke to an attorney that specializes in federal EEO law regarding possible discrimination with his supervisor, RS, on July 29, 2013.  On October 26, 2013, the Complainant filed a formal complaint of discrimination.  Both RS and DH became aware of the formal Complainant in November 2013.

- For Fiscal Year 2013, which ended on September 30, 2013, the Complainant received an "Excellent" performance evaluation.  His performance pay standards were unchanged from Fiscal Year 2012.  He had an "Excellent" rating in Fiscal Year 2012 and received performance pay.

- The Complainant's supervisor, RS, and the facility director, DH, both testified that they denied the Complainant performance pay for Fiscal Year 2013. They testified that the Complainant did not deserve performance pay because he did not perform duties above his regular responsibilities. Decisions regarding performance pay were made between October 2013, and February 2014, to meet the March 2014 deadline disbursement.

- Out of 267 physicians who received at least "Excellent" ratings, the Complainant was the only one that did not receive performance pay by the March 2014 deadline.

The responsible management officials are Dr. Ralph Schapira, Chief of Staff; and Mr. Daniel Hendee, Director.  Please ensure that the Agency, provides Mr. Hendee and Dr. Schapira with 8 hours of training on Title VII and reprisal.  The training shall be mandatory, conducted by an Office of Resolution Management (ORM) subject matter expert, and completed within 90 days of the issuance of this final agency decision.  If an ORM trainer is unavailable, ORM will provide the training content, and the trainer

Page 2.

Finding of Discrimination at the VA Medical Center, Philadelphia, Pennsylvania

identified by the facility must be certified by ORM as an Equal Employment Opportunity subject matter expert.

Furthermore, please determine whether the conduct of Dr. Schapira and Mr. Hendee warrant disciplinary action and, if so, take such action.  This determination should be based on OEDCA's final decision and those factors that would be considered in any other disciplinary action.  Upon receipt of a referral, OEDCA, the Assistant Secretary for Human Resources and Administration (HRA) will create a follow-up file.

Please provide a follow-up report within 60 days, or as soon thereafter as possible, to HRA detailing your determination and any action you have taken in this regard.

You should also ensure that the Philadelphia VA Medical Center Director submits a compliance report to the Deputy Assistant Secretary (DAS) for Resolution Management (08B) regarding the remedial relief provided for in the OEDCA decision.  The Director, OEDCA, has already provided the Philadelphia VA Medical Center Director with a copy of her decision and has requested the Deputy DAS for Resolution Management to monitor compliance.


Jose D. Riojas
Chief of Staff

**DEPARTMENT OF**
**VETERANS AFFAIRS**

# MEMORANDUM

**Date**:

**From:**   Director, Office of Employment Discrimination Complaint Adjudication (00D)

**Subj:**   Referral of Finding of Discrimination, Mukesh Jain (VA Case No.   200H-0642-
2013104692) at the VA Medical Center in Philadelphia, Pennsylvania

**To:**   Assistant Secretary for Human Resources and Administration (051)

1.   Pursuant to Public Law 105-114, I have reported a finding of discrimination in the
above case.

2.   Accordingly, please take appropriate follow-up action regarding possible discipline
in this case.  Copies of the decision and referral memorandum are attached.

3.   Provided the information was available to us, the grades of the individuals found to
have been responsible are noted in the attached decision and/or referral memorandum.

Maxanne R. Witkin

Attachments